## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Apr 23, 2019

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **RENFROW, MIRANDA KRISTIN,** | ) | **Case No. 17-10385-R** |
| | ) | **Chapter 7** |
| Debtor. | ) | |

---

| | | |
|---|---|---|
| **MIRANDA KRISTIN RENFROW** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Adv. No. 17-1027-R** |
| | ) | |
| **COURTNEY GROGAN,** | ) | |
| **SUCCESSOR TRUSTEE OF THE** | ) | |
| **JOE C. COLE REVOCABLE** | ) | |
| **TRUST, UNDER TRUST AGREE-** | ) | |
| **MENT DATED MARCH 28, 2002,** | ) | |
| **and ATKINSON, HASKINS,** | ) | |
| **NELLIS, BRITTINGHAM, GLASS** | ) | |
| **& FIASCO, P.C.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Before the Court is the Amended Complaint for Violation of the Permanent Discharge

Injunction ("Complaint") asserted by Plaintiff Miranda Renfrow ("Renfrow") against

Defendants Courtney Grogan, Successor Trustee of The Joe C. Cole Revocable Trust, under

Trust Agreement dated March 28, 2002 ("Grogan"), and Atkinson, Haskins, Nellis,

Brittingham, Glass & Fiasco, an Oklahoma Professional Corporation ("AHN") (collectively,

"Defendants"). Renfrow alleges that Defendants, among other things, continued to prosecute

a prepetition action against her in Tulsa County District Court and obtained a jury verdict and

judgment imposing *in personam* liability against her for prepetition debts in violation of the

Court's discharge order and the discharge injunction imposed by 11 U.S.C § 524(a)(2).[1] Renfrow requests that this Court find Defendants in civil contempt under § 105(a), and sanction Defendants accordingly.

Trial on the merits was held on November 29 and 30, 2018. Upon consideration of the testimony offered and exhibits admitted at trial, oral and written arguments of counsel, and the record in this Adversary Proceeding and in Renfrow's underlying bankruptcy case, the Court makes the following findings of fact and conclusions of law.

## I.    Jurisdiction

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(1) and (2), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma. As explained below, the Rooker-Feldman doctrine does not deprive this Court of jurisdiction over this Adversary Proceeding.

## II.    Findings of fact

Renfrow is an ophthalmologist. Prior to 2013, she practiced eye medicine and surgery in McAlester, Oklahoma, through her wholly-owned professional corporation, Envision Medical & Surgical Eye Care, P.C. ("Envision"). At all relevant times, Renfrow was the sole owner and officer of Envision.

Grogan's father, Joe C. Cole, was also an ophthalmologist ("Cole"). Cole's practice was managed by and through Associated Ophthalmology of Tulsa, Inc. ("AO"). The Joe C. Cole Revocable Trust ("Trust") was AO's sole shareholder.

---

[1]Unless otherwise indicated, all references to "Section" and "§" herein relate to sections of the Bankruptcy Code, Title 11 of the United States Code.

In November 2012, Cole passed away, and the Trust decided to sell AO's assets, which consisted of obsolete equipment, dated furnishings, and "All Patient Files and Business Goodwill."[2]  In order to maintain the practice as a going concern pending a sale, the Trust employed Renfrow to continue caring for AO's patients.  In late February of 2013, Envision and Renfrow entered into an agreement with the Trust to purchase AO's assets for $100,000, payable pursuant to a $100,000 promissory note secured by a lien on certain assets.[3]  Renfrow admits that she and Envision signed an agreement and a $100,000 promissory note in favor of the Trust ("Purchase Money Loan").

In January 2013, prior to Renfrow's execution of the purchase agreement, the Trust deposited $50,000 into AO's bank account to keep the practice afloat until a sale could be consummated.  AO's office manager, Carrie Pettigrew, booked the transaction as a loan to Envision and Renfrow ("Bridge Loan").  Renfrow denied executing any agreement to accept or repay the Bridge Loan.[4]

In April 2013, Renfrow and Envision refurbished the office and replaced AO's obsolete ophthalmology equipment with modern equipment they leased from the McAlester hospital where Renfrow had previously practiced.  In May 2013, AO was reopened under the name of Envision.

---

[2]Renfrow Exhibit 2 at 10-11.

[3]Id. at 5, ¶ 2.

[4]The Asset Purchase and Sale Agreement admitted into evidence herein is unsigned. Renfrow admitted that she signed an agreement to purchase AO, but contends that the unsigned Asset Purchase and Sale Agreement does not accurately reflect what she agreed to because she had crossed out references to the Bridge Loan before signing the document.

Pettigrew continued in the role of office manager during and after the practice transitioned from AO to Envision.  Pettigrew took control over Envision's billing, banking, accounting, and bill-paying, all to the exclusion of Renfrow.  Renfrow felt intimidated by Pettigrew, and Pettigrew denied Renfrow access to Envision's banking and financial records. Eventually, Renfrow discovered that Envision was not paying its bills or maintaining its debt service in a timely manner.  She also discovered that Pettigrew, who had signatory authority on the Trust's checking accounts, had caused the Trust to transfer funds to Envision to cover revenue shortfalls.  Pettigrew recorded the transfers, which totaled more than $75,000, as loans from the Trust to Envision and Renfrow ("Operational Loans," which together with the Purchase Money Loan and the Bridge Loan, will be referred to as the "Loans").

When Renfrow discovered that Envision was inexplicably broke and mired in debt, she terminated Pettigrew's employment, and caused Envision to sue Pettigrew for alleged embezzlement.  In response, Pettigrew sued Envision and Renfrow for alleged defamation and intentional infliction of emotional distress (the "Intentional Tort Claims").

In May 2016, Grogan, on behalf of the Trust, filed a petition in Tulsa County District Court against Envision and Renfrow, alleging they breached the Asset Purchase and Sale Agreement and defaulted on the Loans (the "Grogan Action").[5]  Grogan also asked to recover the furniture and equipment that served as collateral.  During discovery, the parties learned that no one was able to produce executed copies of any of the final transaction

---

[5]Defendants' Exhibit 102.  The case is styled Courtney Grogan, Successor Trustee of The Joe C. Cole Revocable Trust, under Trust Agreement dated March 28, 2002 v. Miranda K. Renfrow, D.O., an Individual, and Envision Medical and Surgical Eye Care, P.C., an Oklahoma Professional Corporation, Case No. CJ-2016-2033, and filed in the District Court for Tulsa County, State of Oklahoma.

documents.  Accordingly, in December 2016, Grogan amended the petition to claim that Envision and Renfrow were unjustly enriched by the Loans ("First Amended Petition").[6]

At that point, Renfrow was not only defending against claims asserted in the Grogan Action, and the Intentional Tort Claims asserted by Pettigrew (which actions were eventually consolidated for discovery), but also she was embroiled in a bitter divorce and custody battle, wherein she sought and obtained a five-year protective order against her husband, Erin. Renfrow was diverted from her ophthalmology practice, and ability to earn a living, by legal maneuvering, discovery demands, custody evaluations, and court appearances in multiple venues.[7]  To maintain Envision's very existence required a sizable infusion of cash from Renfrow's personal tax refunds.[8]  Envision was not sustainable as a going concern; its 2016 net income (and therefore Renfrow's net income) was less than $7,600.[9]

So in January 2017, Renfrow began the process of closing Envision.  She stopped seeing patients, referred certain patients to doctors they had seen previously, and delivered charts of the remaining patients to an ophthalmologist who agreed to house and maintain the records and insure continuity of care.[10]  Renfrow's decision to place patient records with

---

[6]Defendants' Exhibit 103.

[7]Transcript of Trial Held on November 29 and 30, 2018, in this Adversary Proceeding (Doc. 98) ("AP Trial Tr.") at 260-61.

[8]Defendants' Exhibit 106 at 85-87.

[9]Id.

[10]Defendants' Exhibit 106 at 77-81, 102.

another provider was consistent with guidelines promulgated by the Oklahoma State Board of Medical Licensure and Supervision.[11]

Also in January 2017, Envision's billing software license subscription expired, so Envision could no longer track outstanding charges, insurance payments, insurance write-offs, or patient co-payments.[12]  With its limited funds, Envision was able to renew the license on a month-to-month basis until the end of February.

 In mid-February 2017, the following occurred:  Envision vacated its leased office space;[13] the McAlester hospital repossessed all the leased medical equipment; and Renfrow moved Envision's furnishings, consisting of old computers, a copy machine, and office chairs, into a garage.  (The obsolete equipment Envision purchased from AO was already stored in Renfrow's garage.)[14]  By the end of February 2017, Envision had no employees other than Renfrow,[15] no medical equipment, no physical location, and no patients or patient files.

Renfrow filed a petition under Chapter 7 of the Bankruptcy Code on March 10, 2017 (the "Petition Date").   Renfrow scheduled Grogan as a creditor holding contingent,

---

[11]See AP Trial Tr. at 262-64, 271; Defendants' Exhibit 158 ("Closing or Relocating the Physician's Office," hereinafter "Oklahoma Medical Board Guide").  The Oklahoma Medical Board Guide recommends that patient records not be turned over to patients, but instead be given to another physician, with notification to the patient, so that there is no gap in patient oversight and care. Id. at 6.

[12]AP Trial Tr. at 317-18.

[13]Defendants' Exhibits 106 at 68; 153 at 31.

[14]AP Trial Tr. at 264-65.

[15]Defendants' Exhibit 153 at 25 (last employee "let go" in February 2017).

unliquidated, and disputed claims.  Renfrow disclosed her professional corporation, Envision, as an asset of her bankruptcy estate, and assigned it a value of zero because it had never been profitable and because its liabilities exceeded its assets.[16]  Grogan received notice of the commencement of Renfrow's bankruptcy case, individually, and through AHN, the law firm that represented her in the Grogan Action.  An AHN lawyer attended the meeting of creditors.

After filing bankruptcy, Renfrow earned income on a temporary per-service basis by performing risk assessments for private health care contractors.

On May 4, 2017, the Trustee of Renfrow's Chapter 7 estate filed a Report of No Distribution.  Thereafter, Renfrow sold on eBay a fluorescein camera that she personally owned and deposited the proceeds ($4,200) into her personal checking account.[17]

Over two days in late May 2017, AHN attorney Clark Phipps, on behalf of Grogan, conducted Rule 2004 examinations of Renfrow and her friend, Mark Davis, who assisted her in shutting down the practice.  Both testified that Envision's patients were referred, and patient charts were delivered, to other practitioners in January 2017.  When Phipps asked Renfrow why Envision did not sell the patient charts, she testified that Envision was out of money and could not continue to maintain an office, so it was necessary to place patients, and their charts, with a practitioner that could immediately take over their care.[18]  Phipps also

---

[16]AP Trial Tr. at 265.  Envision itself did not file bankruptcy.

[17]Defendants' Exhibit 106 at 75-76; Defendants' Exhibit 153 at 32; Defendants' Exhibit 156 at Exhibit 25 (transaction dated 5/12/17).

[18]Defendants' Exhibit 106 at 77-81, 102.  See also AP Trial Tr. at 316-17.

questioned the deponents about the status of Envision's final accounts receivable.  They testified consistently as follows:  Davis downloaded and printed out a list of raw data from the discontinued billing software, which data was broken down into various categories of payors and aging.  Patients who owed co-payments or deductibles, which represented a small fraction of the entire receivables list, were sent final billing statements.  Envision collected some receivables postpetition, and Renfrow withdrew those funds from Envision's account and used them for living expenses.  The Rule 2004 examinations concluded on May 19, 2017.

The deadline to file a complaint to object to Renfrow's discharge, or to the dischargeability of individual claims, was June 5, 2017.  Grogan did not file a complaint. AHN did file, on behalf of Grogan and Pettigrew, a Joint Motion . . . for Relief from Automatic Stay ("Joint Motion"), wherein both creditors sought relief to continue discovery against Envision.  In addition, they requested stay relief to allow Pettigrew to pursue her Intentional Tort Claims against Renfrow – this request was based upon the mistaken belief that prepetition intentional tort claims were *per se* non-dischargeable.[19]

On June 15, 2017, Renfrow obtained a discharge of all dischargeable debts, including all claims asserted in the Grogan Action.  Grogan and AHN received the order of discharge by mail and through the Court's ECF system.  Sometime in June 2017, Renfrow accepted a position at an eye clinic in New England and moved there to begin rebuilding her life and career.

---

[19]Joint Motion, Renfrow Exhibit 11.  Pettigrew did not timely file a complaint under § 523(a)(2), (4), and (6) to except the tort claims from discharge.

On June 21, 2017, the Court held a hearing on the Joint Motion.  At the hearing, the Court confirmed that the order for relief in Renfrow's case did not stay actions against non-debtor Envision.  The Court also concluded that the request for stay relief to permit Pettigrew to prosecute her tort claims against Renfrow became moot when Renfrow's discharge was entered.[20]

On June 22, 2017, Phipps sent the following email to Grogan:

A discharge has now been granted Dr. Renfrow in the bankruptcy court. . . . We have discussed to what extent the Trust should pursue its state court suit against Envision since it has virtually if not actually no assets.  I raised the possibility of amending our suit to add a new claim directly against Dr. Renfrow for fraudulently transferring the accounts receivable away from Envision after the date of bankruptcy.

You requested that we research two legal issues to assist you in determining how to proceed in the state court.  First, you would like a description of the proposed claim for fraudulent transfer including some description of the chances of prevailing and the potential value of a judgment.  Next, you would like some idea about whether or not an Oklahoma judgment can be collected in New Hampshire where Dr. Renfrow has moved. . . .

If there are other questions that have come up since our last discussion, let me know.[21]

So just days after Renfrow was relieved of personal liability on the Loans, and the day after Phipps was advised that prepetition tort claims were not excepted from Renfrow's discharge, Phipps and Grogan discussed dragging Renfrow back into court to defend against allegations of postpetition fraud.  By mid-July, AHN had drafted a Second Amended Petition claiming that Renfrow caused Envision "to transfer substantial assets from its bank accounts"

---

[20]Renfrow Exhibit 16.

[21]Defendants' Exhibit 109.

to Renfrow, "without exchange of reasonable compensation with the intent to hinder, delay, and defraud" Grogan in violation of the Oklahoma Uniform Fraudulent Transfer Act ("UFTA").[22]  What factual basis did Grogan and Phipps have for this new claim?

At trial to this Court, Phipps said that he relied solely on Renfrow's and Davis's Rule 2004 testimony.  Phipps testified: "We know they were collect – she was depositing checks into her account from those accounts receivable.  She admitted in her 2004 deposition doing that and . . . Mark Davis was quite explicit about their collection  personally into Renfrow's personal bank accounts and pocket [sic] Envision accounts receivable."[23]  "She deposited directly into a personal account checks made to Envision.  There were checks made payable to her, which she put in the Envision account, and then drained the Envision account."[24] Phipps misrepresented the Rule 2004 testimony, however.  Neither Renfrow nor Davis ever said that Renfrow deposited Envision's checks into her personal account.  Nor did they testify that patients were instructed to make checks payable to Renfrow.  Instead, both clearly and unambiguously testified that Renfrow caused Envision to deposit its collected receivables into Envision's bank accounts, and that Renfrow later withdrew funds to pay living expenses.

At his Rule 2004 exam, Davis had produced an Excel spreadsheet that organized information he downloaded from Envision's discontinued billing software on March 18,

---

[22]Renfrow Exhibit 21 at 4, ¶ 16.

[23]AP Trial Tr. at 179-80.

[24]<u>Id</u>.

2017, about a week after Renfrow filed bankruptcy.[25]   Although Davis called the document an "accounts receivable" spreadsheet, he also testified that there was no way to determine the value of the receivables because the document did not reflect the discounts that Medicare and private insurers had required Envision to write off.[26]  Of the $76,000 of non-discounted charges listed, approximately $55,000 was 90 days or more past due.  The total owed by patients for co-payments and deductibles was approximately $8,000.[27]  Davis testified that final invoices were sent to these patients, and that according to his spreadsheet, as of April 6, 2017, Envision had collected $960.[28]

Davis testified that any Medicare and insurance payments made postpetition would have been directly deposited by the insurers into one of Envision's bank accounts, and that such deposits would be reflected on *Envision's bank statements*.[29] Renfrow also testified that *all postpetition patient payments would be reflected in Envision's bank statements*.[30] When

---

[25]Defendants' Exhibit 153 at 10. Renfrow also testified that when Envision could no longer pay for the software license, Davis printed "an accounts receivable one last time on paper so we could do our final round of patient statements and check people off who paid." Id. at 39.

[26]Defendants' Exhibit 153 at 12-13, 15-16.

[27]Exhibit 10 to Defendants' Exhibit 153, at 29.

[28]Defendants' Exhibit 153 at 18.

[29]Defendants' Exhibit 153 at 19-20.

[30]Envision had two bank accounts, one at First National Bank of McAlester and one at Commerce Bank.  Defendants' Exhibit 106 at 83. All collections "either went in McAlester or Commerce Bank."  Id. at 61.  "Medicare money came into the First National [Bank of McAlester]" and "private insurance and patient checks . . . all of that went into the Commerce account."  Id. at 83-84.

asked whether the funds were still in the account, Renfrow said "No.  I used them to live

after we closed."[31]

On August 1, 2017, AHN filed the Second Amended Petition,[32] which was identical

to the First Amended Petition except for the addition of these two paragraphs:

> 16.  After the filing of the original Petition in this matter and after
> [Renfrow] filed for bankruptcy, [Renfrow], as an insider of [Envision] caused
> [Envision] to transfer substantial assets from its bank accounts to [Renfrow],
> individually, without exchange of reasonable compensation with the intent to
> hinder, delay, and defraud [Grogan] as one of its creditors in direct
> contravention of the Oklahoma Uniform Fraudulent Transfers Act ("UFTA"),
> 24 O.S. §§ 112-123.
>
> 17.  The violation of the UFTA threatens [Grogan's] ability to obtain
> fair compensation in this matter.  Therefore, [Grogan] is entitled to a judgment
> attaching to all assets transferred by [Envision] in contravention of the
> UFTA.[33]

In Paragraphs 1 through 15, the Second Amended Petition continued to allege that the

Defendants – Envision *and* Renfrow – breached "their promise to repay these additional

_____

[31]Id. at 61.

[32]Prior to filing the Second Amended Petition, Grogan asked the state court for leave
to amend.  Defendants' Exhibit 108. AHN contacted Renfrow's attorney in the Grogan
Action, BreeAnn Rice, to ask whether Renfrow opposed the amendment.  Ms. Rice "was
unsure if she still represented [Renfrow] in this matter, and she did not respond to [Grogan's]
request to file this Application unopposed."  Id. at 2, ¶ 6.  Ms. Rice did not file a response
to the application, and Grogan was granted leave to file the Second Amended Petition.
Defendants' Exhibit 111.

AHN and Grogan argue that Ms. Rice's failure to object to the application justified
their belief that the Second Amended Petition did not violate the discharge injunction. To the
extent that they contend that Ms. Rice's inaction waived Renfrow's right to claim that the
Second Amended Petition violated the discharge, their contention is without merit because
§ 524(a)(2) provides that the discharge injunction cannot be effectively waived.  See, e.g.,
In re Gurrola, 328 B.R. 158, 164 (B.A.P. 9th Cir. 2005).

[33]Defendants' Exhibit 112 at 4.

loans[,] and the principal and outstanding interest are due and payable."[34] Both Envision *and*

Renfrow were also still charged with being "unjustly enriched at the expense of [Grogan]

such that restitutionary damages are warranted."[35]  Finally, the prayer for relief in the Second

Amended Petition was identical to the prayer in the First Amended Petition.  Both state:

> WHEREFORE, it is respectfully requested that judgment in an amount
> exceeding Ten Thousand Dollars ($10,000) be granted in favor of [Grogan]
> and against the *Defendants Miranda K. Renfrow, individually, and [Envision],*
> together with attorney's fees, costs, interest, and any other relief this Court
> should deem equitable.[36]

Before filing the Second Amended Petition and accusing Renfrow of taking

"substantial" sums from Envision's bank account with the actual intent of defrauding

Grogan, Phipps/AHN had not conducted any further formal or informal discovery.  Phipps

did not bother to review Envision's bank statements.   As Phipps's June 22nd email

establishes, Phipps and Grogan believed that Envision was judgment-proof, but they

continued their suit against Envision in order to reduce the Loan claims to judgment, and

then added a claim to collect the judgment from Renfrow by accusing her of looting

Envision's bank accounts.

Renfrow was distraught upon receiving the Second Amended Petition.  She expected

that her bankruptcy and discharge would end the painful, emotional, and costly litigation with

Grogan and Pettigrew.  She was hoping to "focus on [my son] and my job for the first time

---

[34]<u>Id</u>. at 3-4, ¶ 12.

[35]<u>Id</u>. at 4, ¶ 5.

[36]<u>Id</u>. at 4-5 (emphasis added).

in years and for the first time not have a huge debt over my head that I had no way of paying back."[37]

The Court finds, by clear and convincing evidence, that the Second Amended Petition, on its face, seeks to collect discharged debt from Renfrow personally.  The allegations supporting both the contract and unjust enrichment claims name Renfrow *and* Envision as owing the debts, and Grogan does not limit her request for judgment against Renfrow to the UFTA claim.

Renfrow contacted her bankruptcy counsel, Ron Brown, and retained him to defend her (and by necessity, Envision) in the Grogan Action.  On August 21, 2017, Brown entered an appearance in the Grogan Action on behalf of both Renfrow and Envision.  Brown drafted and filed an answer to the Second Amended Petition.  In addition to general denials, Renfrow asserted that Grogan was "violating the permanent injunction against collecting discharged debts under 11 U.S.C. § 524(a)(2)."[38]

In a phone call, Brown asked Phipps to dismiss the two discharged claims.  Phipps' initial reaction was to decline, but he said he would think about it.[39]  After a second conversation, Phipps told Brown that he would recognize the effect of the discharge in the pretrial order to be entered in the Grogan Action.  On August 24, 2017, Phipps emailed

---

[37]AP Trial Tr. at 268-69.  Renfrow's estranged husband refused to agree to allow their son to leave Oklahoma, however, and the custody litigation also continued unabated.

[38]Defendants' Exhibit 113 at 3.

[39]AP Trial Tr. at 32.

Brown a proposed pretrial order.  That document did not limit the contract and unjust enrichment claims to Envision, however.[40]

On August 26, 2017, Brown filed the Complaint that commenced this Adversary Proceeding.  Paragraph 19 of the Complaint summarizes the discharge violation:

> Despite[] knowing of the bankruptcy discharge, the *Second Amended Petition* alleges 3 causes of action against [Renfrow].  The first two causes are identical to those contained in the *Amended Petition* filed on December 7, 2016, which are breach of contract and unjust enrichment.  Additionally, [Grogan and AHN] included a third count which appears to create a new cause of action based on post-discharge conduct, but is, rather, a ruse to continue litigation against [Renfrow] and to bootstrap the monetary claims previously alleged. [Grogan and AHN] took no specific action to remove [Renfrow], individually, from the litigation even though [Grogan and AHN] were aware that the bankruptcy discharge protected her from continued litigation on the discharged debt.[41]

On August 28, 2017, Phipps emailed another proposed pretrial order to Brown. Phipps stated: "I do not intend to and have not pursued any claims against Dr. Renfrow except for the newly added cause of action.  The original causes of action are contained in the amended petition because it is just that, an amended petition.  Those causes of action were discharged."[42]  Brown replied: "I disagree with your analysis on what an amended petition does.  The Second Amended Petition was filed after the bankruptcy discharge and asked for a money judgment against Dr. Renfrow.  Please file dismissals with prejudice as

---

[40]Renfrow Exhibit 25. That version of the pretrial order apparently omitted the page that had a provision limiting the prepetition claims to Envision.  The parties later agreed that the omission was the result of a formatting error.

[41]Defendants' Exhibit 115 at 4, ¶ 19.

[42]Defendants' Exhibit 116.

to counts one and two as to Dr. Renfrow."[43] Phipps emailed Brown another copy of his proposed pretrial order and said: "I can file dismissals of the pre-bankruptcy claims against Dr. Renfrow[.] The easiest way would be to make a specific dismissal statement in the PTO. Would that work?"[44]

On August 29, 2017, Phipps emailed Brown a letter requesting that Brown withdraw Renfrow's Complaint, contending that the Complaint did not have any basis in law or fact, because "[n]either myself nor my client have any intention of avoiding or circumventing the discharge that was granted Dr. Renfrow."[45] He rationalized that the Second Amended Petition did not violate the discharge because it "makes specific reference to Dr. Renfrow's bankruptcy," and the petition "was not intended to circumvent the bankruptcy discharge or attempt to resurrect discharged claims."[46] Phipps also reiterated that his proposed pretrial order would make it clear that Grogan did not seek relief on the two discharged claims, and opined that "it seems procedurally awkward to dismiss claims that are already discharged."[47]

Brown replied the next day. He noted that the latest proposed pretrial order was different than the one Phipps sent previously. Brown also stated that he had not been able to contact Renfrow to discuss dismissal of her Complaint, but, he advised, the Second Amended Petition had already caused Renfrow damages in the form of emotional distress

---

[43]Id.

[44]Id. at 2.

[45]Defendants' Exhibit 117 at 1.

[46]Id.

[47]Id. at 2.

and unnecessary attorney fees.  Unless the two discharged claims were dismissed, he would "have a duty to defend Dr. Renfrow on those counts, that is until the judge signs a pretrial order dismissing Dr. Renfrow individually.  Any attorney fees incurred until then are part of the damages my client will insist to be reimbursed or part of a judgment resulting from the Adversary complaint."[48]  Brown once again demanded that Grogan immediately dismiss the discharged claims.

In an email to Brown dated September 1, 2017, Phipps blamed the difference in pretrial orders on formatting issues.  He claimed "[t]here are no 'counts 1 & 2' against Dr. Renfrow personally. . . .  You know that, I have confirmed and re-confirmed it.  Your statement to the contrary is a self-serving effort to 'gin up' damages."[49]  Nevertheless, Phipps did file dismissals of the two discharged claims that same day.[50]

In mid-September 2017, Brown attended a pretrial conference in the Grogan Action, which was continued to November 13, 2017.  Later in September 2017, Phipps sent Brown another proposed pretrial order.  This one stated "[a] Partial Dismissal for those discharged, pre-bankruptcy claims was filed September 1, 2017."[51]  It also recited, relevant to the UFTA claim against Renfrow–

> After filing bankruptcy, . . . [i]n contravention of its creditors, Defendant Renfrow conveyed all of Envision's remaining assets to herself with no

---

[48]Defendants' Exhibit 120.

[49]Id.

[50]Defendants' Exhibit 123.

[51]Renfrow Exhibit 31 at 2.

considerations [sic] whatsoever.  The Trust seeks to recover these fraudulently conveyed assets.[52]

Plaintiff is entitled to judgment against Defendant Renfrow for the value of the fraudulently conveyed assets of Envision totaling not less than $80,500.[53]

According to Phipps, the $80,500 damages figure represented the "face value of the accounts receivable after bankruptcy of $76,000" and the proceeds of the sale of Renfrow's fluorescein camera.[54]

In late October 2017, AHN and Grogan finally subpoenaed Envision's bank statements and check images.  The Commerce Bank statements established that the $76,000 of non-discounted so-called receivables that appeared on Davis's printout produced less than $3,500 in deposits,[55] and of that amount, Renfrow withdrew only $3,155.[56]  Envision's McAlester bank account, the one that accepted Medicare's direct-deposits, did not post *any* postpetition payments from Medicare or any withdrawals by Renfrow.[57]  The bank records undermined Grogan's demand for damages of at least $80,500.

---

[52]Id.

[53]Id. at 3.

[54]AP Trial Tr. at 208-09 (citing Davis's Rule 2004 testimony).

[55]Trial Exhibit 11 admitted in the Grogan Action Trial (all "Grogan Action Trial Exhibits" are admitted herein as Defendants' Exhibit 156); Renfrow Exhibit 52 (summary).

[56]Grogan Action Trial Exhibit 11.

[57]Id.  AHN and Grogan also subpoenaed Renfrow's personal banking records.  These records established that Renfrow did not deposit Envision's collected receivables directly into her personal accounts.  Grogan Action Trial Exhibit 12.

A final pretrial order was entered on November 13, 2017, setting a December 6th trial date. With respect to the UFTA claim against Renfrow, Grogan set forth her "Assertion of Fact" as follows:

> Defendant Renfrow diverted the remaining assets of Envision to herself.  In contravention of its creditors, Defendant Renfrow conveyed all of Envision's remaining assets to herself with no considerations [sic] whatsoever.  The Trust seeks to recover these fraudulently conveyed assets.[58]

Renfrow asserted the factual basis of her defense as follows:

> Renfrow obtained a bankruptcy discharge and all debts owed by Renfrow preceding March 10, 2017 have been discharged.  Plaintiff alleges that Renfrow, after March 14, 2017, wrongfully and fraudulently transferred property of Envision for her own use in violation of [the UFTA].  Renfrow denies the allegation.[59]

In the "Plaintiffs' Contentions" section of the pretrial order, Grogan stated:

> 6.  In anticipation and following the filing of Chapter 7 bankruptcy, Defendant Renfrow conveyed to herself all of Defendant Envision's assets with the intent to hinder, delay and defraud creditors in violation of the [UFTA].

> *****

> 9.  Plaintiff is entitled to judgment against Defendant Renfrow for the value of fraudulently conveyed assets of Envision.[60]

In the Defendants' Contentions section, Renfrow denied the claims and asserted various defenses including Renfrow's bankruptcy discharge.[61]

---

[58]Renfrow Exhibit 34 at 2.  Objectively, it appeared that in the pretrial order, Grogan conceded that she could no longer prove damages of at least $80,500.

[59]Id. at 3.

[60]Id.

[61]Id. at 4.

19

Going into trial, Renfrow and Brown justifiably believed that the only transfers at issue were the checks Renfrow wrote from the Envision bank account to herself postpetition, and that the bank records represented the amount at issue, *i.e.*, $3,155.[62]  The Second Amended Petition referred only to transfers from Envision's bank accounts.  The only other possible postpetition transfer of Envision's assets that was ever alluded to was the sale of the fluorescein camera, which Renfrow consistently testified was her personal property.  The Second Amended Petition made no mention of the camera.

Phipps insisted, over and over, that he did not intend to litigate discharged claims, or seek relief for conduct that occurred prior to March 10, 2017, Renfrow's Petition Date.[63]  As a result, Brown did not prepare to offer exhibits or witnesses concerning events that Grogan and Phipps knew occurred prepetition, such as the timing of events related to winding up the practice.  "There was never really a dispute about when [Renfrow] closed down her office or that she closed it down before her bankruptcy."[64]  Grogan and AHN also knew that Envision's remaining personal property – the old equipment and furniture that served as the Trust's collateral – had been in Renfrow's garage, and that Renfrow had invited Grogan to pick it up.[65]

---

[62]AP Trial Tr. at 38-39, 43-48, 55.

[63]A discharge entered under § 727 "discharges the debtor from all debts that arose before the date of the order for relief."  11 U.S.C. § 727(b).

[64]AP Trial Tr. at 39.

[65]Defendants' Exhibit 106 at 90.

Prior to trial, Renfrow offered to pay Grogan the amount she withdrew from Envision's account postpetition.[66]  Grogan and AHN, however, insisted going to trial.

For three days in December 2017, the claims against Envision and Renfrow were tried to a jury.  The judgment roll of the Grogan Action, a partial transcript of the trial,[67] and the exhibits admitted at trial, have been admitted into evidence herein.  The Court has fully reviewed those documents, and will summarize the testimony and arguments relevant to Renfrow's claim that Grogan and AHN violated her discharge during the Grogan Action trial, and relevant to damages.

AHN attorney Dru Prosser called as Grogan's first witness Renfrow's estranged husband, Erin.[68]  Erin testified that he was present and participated in the decision-making process when Envision and Renfrow purchased AO's assets in 2013.  He testified that he and

---

[66]AP Trial Tr. at 255-57.  Defendants objected to this Court admitting evidence concerning the pretrial settlement discussions, which objection was taken under advisement. Under the Federal Rules of Evidence, settlement offers and statements made during settlement negotiations are generally inadmissible "either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). Renfrow's offer and Defendants' non-acceptance was not offered in this Adversary Proceeding for the purpose of establishing the validity or amount of Grogan's UFTA claim, however, but rather to indicate what Renfrow and Brown believed was at issue prior to trial.  The evidence is also relevant to Renfrow's damages, including but not limited to the necessity and reasonableness of fees incurred in defending the UFTA claim and prosecuting this Adversary Proceeding.  Defendants' objection is overruled.

[67]The transcript submitted as Defendants' Exhibit 127 includes Volumes II and III of the full transcript.  It does not include voir dire or opening statements, which apparently are found in Volume I.  Citations to the Grogan Action trial transcript herein will be to pages of Volume II ("Tr. Vol. II") or Volume III ("Tr. Vol. III").

[68]At the time of the trial, Renfrow and Erin were in the fourth year of a "acrimonious" divorce proceeding, and Erin was restrained under a five-year protective order from being anywhere near Renfrow.

Renfrow considered Cole's well-established patient base and referral network, which he described as goodwill, to be the deciding factor acquiring the practice for $100,000. "[Y]ou've already got this patient base to grow off of so it's instant income, it's instant revenue, it's instant taking care of all your overhead.  And now, you've got all of those network relationships, especially with Carrie [Pettigrew], the office manager who's been talking with all these other doctors for years and years."[69]  He testified that AO's furnishings and equipment were old and obsolete, and "had no real value for us. . . .  The only thing we were really buying was, predominantly, was the goodwill."[70]

Renfrow denied that Erin had played any part in the purchase because they were legally separated at the time, but she agreed that "the patient charts, the ongoing practice, . . . goodwill" was valuable.[71]  Phipps asked: "[I]f you're going to keep those patient relationships and the relationships and referrals to the doctors, you've got to have your doors open, a staff who answers the phone, who can schedule those patients, who can arrange for you to see them so that your goodwill is maintained until Miranda Renfrow makes the transition, closes her McAlester office and is full time in Tulsa.  You'd agree with that, wouldn't you?" –  to which Renfrow answered "Yes."[72]

Phipps also asked: "[I]f you didn't have that [leased] equipment, you couldn't see patients. . . [and] if you didn't have patients, you didn't have a practice," to which Renfrow

---

[69]Tr. Vol. II at 12.

[70]Id. at 23.

[71]Id. at 185-86.

[72]Id. at 202.

replied, "That's right."[73]   Then, Phipps stated: "Now, you had to close your doors.  Quit seeing patients in February 2017," and Renfrow agreed.[74]  Phipps then elicited that the office had been cleaned out and the mail redirected.

Later, Phipps asked a series of rhetorical questions about the value of Envision's practice before Renfrow's bankruptcy, contending that it was more valuable than it was when she purchased it.

> Q [by Phipps] [Y]ou were willing to pay dollars for the goodwill of Dr. Cole's patient population.
>
> A [by Renfrow] Yes.
>
> Q      And you made it better so that by the time of the bankruptcy, it was worth more.
>
> A      No, it wasn't because of the litigation, negativity that all of this has attracted.  It was horrible. . . .
>
> Q      And you enhanced your relationship to your patients.  You brought patients up from McAlester and added new patients.
>
> A      And you decimated it.
>
> Q      So the value at the time of your bankruptcy was based on a bigger population of patients, a stronger relationship, and a stronger practice base.
>
> A      I went from doing ten surgeries a week to maybe three a month and that wasn't because of bad outcomes. . .  You can't survive on that. . . .
>
> Q      Dr. Renfrow, those charts, all your patient charts, did you sell those charts and that goodwill of Envision when you went through your bankruptcy?
>
> A      No.

---

[73]Id. at 217.

[74]Id. at 218.

Q       You took possession of them and transferred them?

A       Yeah.  Patients had to have continuity of care.  It was more about that. I didn't have time to assess a dollar value.

Q       So how many patient charts did you transfer . . . .  How many Banker boxes of charts?

A       I guesstimate about 80.

Q       You took them out of . . . the Envision office, I guess, and moved them?

A       To someone who said they would assume care and patients could contact.  They could either stay with that physician or they'd have access to their records.

Q       Okay.  And no way to market, advertise or –

A       There was no time.

Q       No time?

A       No.  I couldn't keep the doors open.  Patients needed care.  There was no time.[75]

Phipps questioned Renfrow about Envision's 2014 depreciation schedule that was admitted as an exhibit.[76]  He focused his inquiries on an "ophthamalic imaging syste[m]," shown as acquired in 2010 with a cost/basis of $10,415, and a "Photographic system" acquired in 2013 with a cost/basis of $9,500.  Phipps attempted to get Renfrow to admit that these items showed that Envision owned the fluorescein camera that Renfrow sold after her bankruptcy.[77]  Renfrow testified, however, that she owned the camera and that the two

---

[75]Id. at 261-64.

[76]Grogan Action Trial Exhibit 17.

[77]Tr. Vol. II at 223-28, 252-60.

depreciated items were software that operated the camera and stored images, which could not be sold because they contained confidential patient information.[78]  Although Envision's 2014 depreciation schedule also reported the cost/basis for Envision's furnishings, other machinery and equipment, and goodwill, all of which were acquired between 2010 and 2013, Phipps did not bring those line items up with any of the witnesses.  Phipps did not elicit any testimony regarding the disposition of the remaining furnishings, machinery or equipment.

With respect to Envision's receivables, Davis and Renfrow both testified, consistent with their Rule 2004 testimony, that Davis's spreadsheet was a list of receivables, but it did not accurately reflect the value of receivables.[79]  Renfrow testified that substantially all receivables collected postpetition were deposited into Envision's bank account – collections totaling $3,398.[80]  Renfrow admitted to withdrawing $3,155 from the account over time to pay living expenses.[81]  Phipps asked Renfrow if she "approach[ed] any collection company about selling those accounts receivable" and Renfrow said "No, because realistically they weren't worth a whole lot."[82]

> Q [by Phipps] So you didn't really make any effort, you took whatever came in and you just let them die a natural death?

---

[78]Id. at 227, 253.

[79]Tr. Vol. III at 32-34, 51.

[80]Id. at 40.

[81]Id.

[82]Tr. Vol. II at 251.

A [by Renfrow] Well, we didn't have enough money at that point in time to pay someone to try and go collect that money.  And quite frankly, there wasn't a lot out there to collect.  That's a hypothetical number.[83]

Renfrow readily admitted that the unpaid balance on the $100,000 purchase price for Cole's practice was  $86,658,[84] and Envision stipulated to a judgment in that amount.

At some point during the trial, Renfrow's counsel, Brown, filed a motion in limine requesting an order "limit[ing] any reference or argument for any activity to support [Grogan's] claim alleging fraudulent transfers on or before March 10, 2017" because "[t]he Bankruptcy Court has exclusive jurisdiction to consider matters related to [Renfrow's] alleged fraudulent conduct before debtor filed bankruptcy."[85]  The motion was granted.

After the close of evidence and the reading of jury instructions, Phipps surprised Renfrow and Brown by expanding the fraudulent transfer claim against Renfrow to include supposed transfers to herself of Envision's goodwill, furniture, equipment, and uncollected receivables, and asking for judgment against Renfrow in the amount of $120,000!  Phipps argued–

> [t]he accounts receivable undisputedly for Envision at the time of bankruptcy have a face value of $76,000. . . .  Now, those assets – that accounts receivable does not have value of $76,000 because it will be discounted on what is recoverable and as it ages.  The testimony, without dispute, is that about 55 percent to 60 percent is the typical recovery.
>
> Now, you heard testimony that Miranda Renfrow says, I only recovered 3,100 or – that's not the measure.  The measure is the value.  She took those, controlled those, and decided what to do with those.  The fact that she may not

---

[83]Id.

[84]Id. at 183.

[85]Defendants' Exhibit 126 at 1.

26

have advertised them, sold them, tried to collect them is afterwards, okay? I have no firm belief that the evidence authentically shows she recovered only $3,100, but I'm requesting a 50 percent discount on those be given and that's why I came up with $40,000. That's about a 50 percent discount of the fair market – of the accounts receivable, face value.

The second item I'm requesting that you award on the verdict for Uniform Fraudulent Conveyance is the goodwill, the charts. . . . Miranda Renfrow made a conscious decision *to buy this practice for $100,000*. [E]veryone agreed who testified that they did not place much value on the furniture. It was a little stale. But she was willing to undertake the $100,000 purchase price in order to get the patient population, the ongoing relationships, the referral from physicians that comes with an ongoing practice. So the goodwill - and that's called goodwill - that's what she bought. She was willing to pay $100,000 for it, less some amount for stale equipment. . . .[86]

Then Phipps displayed Envision's 2014 depreciation schedule on a screen as he argued –

Miranda Renfrow, with Envision, ascribed $49,500, $50,000, forty-nine five, as the value of the goodwill she purchased. Now having taken advantage of that - by that, I mean nothing inappropriate, for declaring that value on her tax returns with her accountant as part of her books - I'm asking that she live with that value today and that that be the value you would give to the goodwill which she disposed of. She took 80 or – 70 or 80 Bankers boxes and gave them to another physician.

Now, the fact that she gave them – if that's, in fact, what happened, that's certainly what she said - that doesn't change the value at the time of transfer, okay? Ongoing medical practices are valuable. I'm asking you to give $50,000 to this ongoing medical practice, goodwill value, which she transferred away from her creditors.

And then there's the equipment. . . . On the amortization table . . . the furniture, . . . [s]he carries this on her books at $31,000. Now, this is a depreciation schedule. It is some evidence, though, of its value. . . . She's carrying medical equipment on her books of $55,000. So that's 80 some thousand dollars she's carrying on her books as the value of her furniture and equipment. Now, this is a couple of years before her bankruptcy and the transfers, but she now says she attributes no value whatsoever. . . .

---

[86]Tr. Vol. III at 131-33 (emphasis added).

We have evidence that there's significant equipment value.  She had possession of it at the time of her bankruptcy that she – when she closed her practice and that it is gone.  We have evidence that it's carried on her books at a significant value.  I'm asking that you make a $30,000 attribution for the value of the equipment that she took away from the possibility of the creditors taking and selling so they could help pay down their debt.  And this is how I came up with $120,000 as the request on behalf of my client on the asset transfer claim.

A couple other items – well, on the underlying claim, the contract claim.  Of course, there are three claims.  The first claim, the judge has instructed you, is over.  Envision owes $86,658.[87]

At this point, Brown requested a bench conference, and objected to Phipps' closing argument, citing the order granting Renfrow's motion in limine.  Blindsided by the argument that Renfrow should be held personally liable for allegedly transferring goodwill, furnishings, and equipment, Brown told the trial court: "[H]e's doing exactly what he wasn't supposed to do.  He's asking for transferred assets before bankruptcy."[88]  Phipps stated: "It's certainly arguable on closing. . . .  It doesn't matter. I haven't made closing argument about assets that – "[89]  The Court interjected:  "Why don't you object if it happens again."[90]

Phipps then made a brief request for a verdict against Envision in the amount of $50,000 for the Bridge Loan and $77,300 for the Operational Loans.[91]

After Phipps concluded, Brown again objected–

---

[87]Id. at 133-35.

[88]Id. at 135.

[89]Id.

[90]Id. at 135-36.

[91]Id. at 136.

[I]n requesting monies from the jury, [Phipps] violated the Court's order on my Motion in Limine, and I'm going to try to find where he did that. He referenced transfers that were made for accounts receivable, charts and equipment that were before March 10th, 2017, prior to the bankruptcy, and he was not allowed to do that. It's improper, Your Honor.[92]

Phipps argued that "[t]he charts were transferred out of the practice. There is no evidence that that was before the bankruptcy, none. If counsel remembers the evidence differently, he can argue it, but there was no evidence that it was before the bankruptcy."[93]

The court instructed the jury that it could consider only transfers made after the March 10, 2017 Petition Date, and that it was for them to determine which assets were transferred after the bankruptcy.[94]

---

[92]Id. at 136-37.

[93]Id. at 138. Significantly, Grogan did not present any evidence that the charts, or any other Envision asset other than bank account deposits, were transferred *after* the bankruptcy either. But by arguing that Renfrow be held responsible for the value of the alleged transfers, Phipps implicitly represented to the jury that each of the newly alleged transfers occurred postpetition, and implied that Renfrow had the burden of proving the alleged transfers occurred prepetition.

Because Phipps had concealed until closing argument that Grogan's fraudulent transfer claim included Envision's goodwill, furniture and equipment, and Envision's uncollected receivables, Renfrow had no reason to believe that she needed to present evidence to disprove those supposed transfers or to establish that they occurred, if at all, prepetition. AP Trial Tr. at 55 (Brown: "I was surprised when I heard it for the first time at closing"), 97-98, 112 (Brown: "I would have brought in Walt Peters, who received the patient charts in January 2017, and we would have put together some document as to when the practice was shut down. But it wasn't an issue.").

Defendants contend that Renfrow "lost" on her discharge defense because she did not prove the timing of the alleged transfers, but as explained fully below, Renfrow did not have the burden of proving anything to preserve her discharge.

[94]Tr. Vol. III at 139.

The amount Envision owed on Purchase Price Loan, $86,658, was established by directed verdict, and the jury found Envision liable for the Bridge Loan and Operational Loans in the amounts requested.  The jury found Renfrow liable on the UFTA claim and fixed damages in the amount of $89,500. The jury was not asked to make any special findings.  On January 3, 2018, the trial court entered a Journal Entry of Judgment ("Judgment").[95]

On January 11, 2018, Renfrow filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, a Motion for New Trial ("JNOV Motion").[96]  The trial court summarily denied the JNOV motion in July 2018, and Renfrow appealed the Judgment and the denial of the JNOV.[97]  The appeal is pending.[98]

In August 2018, AHN, on behalf of Grogan, filed a motion to tax costs and attorney fees against Envision and Renfrow,[99] which included costs incurred prepetition.

A.   The UFTA claim for transferring Envision's goodwill arose, if at all, prepetition.

Based upon the above findings of fact, and the record in this proceeding, this Court finds by clear and convincing evidence that on the day Renfrow filed bankruptcy, Envision

_____

[95]Defendants' Exhibit 131.

[96]Renfrow Exhibit 39.

[97]Renfrow Exhibits 43, 44.

[98]As of November 30, 2018, when this matter was tried, the record on appeal had not yet been lodged with the Oklahoma Supreme Court, and nor had a briefing schedule been established.

[99]Renfrow Exhibit 45.

had no patient charts, but more importantly, it had no goodwill.  Goodwill of a business consists of the intangible assets of a *going concern*.[100]  These intangibles, such as charts and patient lists, phone numbers, institutional reputation, familiar location, trained workforce, and established policies and procedures, have value to a purchaser to the extent they represent an opportunity to step into a thriving practice with an established income stream.[101]

It is indisputable that in 2016, Envision had insufficient cash flow to maintain operations or pay its employees, was in default on its lease obligations, and had significant outstanding long term debt.  Renfrow stopped seeing patients in January 2017, and Envision closed its doors for good in February 2017.  Patient charts were delivered to another practitioner in January 2017, more than a month before Renfrow filed bankruptcy.  Envision's goodwill – its book of patients and its ongoing business – simply did not exist as of February 2017.  The alleged transfer of goodwill that Phipps valued at $50,000 had to occur prepetition, *if at all*.[102]  Thus, as explained in the conclusions of law below, Grogan's

---

[100]See Smith v. Nicholas/Earth Printing, LLC (In re Bob Nicholas Enter. Inc.), 358 B.R. 693, 703 (Bankr. S.D. Tex. 2007) ("goodwill does not exist apart from a reasonably profitable business. . . .  Once the business ceases to operate, good will is extinguished.").

[101]See Daniel M. Bernick, Ophthalmology Practice Value and Goodwill (April 25, 2016) (published by The Health Care Group, Inc., publishers of the Goodwill Registry, a database of actual goodwill values paid in health care practice transactions).

[102]It is this Court's opinion that Renfrow was never a transferee of Envision's charts or patient population under the UFTA.  "[T]he principal of a corporate debtor does not become a 'transferee' by the mere act of causing the debtor [to] make a fraudulent transfer. . . . [t]his result is consistent with the fact that corporations must always act through individuals." Rupp v. Markgraf, 95 F.3d 936, 943 (10th Cir. 1996), *quoting* General Electric Cap. Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.), 185 B.R. 801, 809 (B.A.P. 9th Cir. 1995).  It is also well established that "couriers" are not transferees. Id. at 941.

claim that Renfrow caused Envision to fraudulently transfer its goodwill was a *prepetition* claim that was discharged in Renfrow's bankruptcy.[103]

### B.     Phipps knowingly misled the jury regarding the alleged transfer of goodwill.

The Court further finds by clear and convincing evidence that Phipps knowingly misled the jury with respect to the existence, value, and timing of the supposed transfer of Envision's goodwill.  Phipps knew that Renfrow stopped seeing patients and that patient charts had been transferred to another ophthalmologist in January 2017.  Phipps knew that Envision had no employees, other than Renfrow, as of the time Envision vacated its office in February 2017.  He knew that all the leased ophthalmology equipment had been repossessed in February 2017.  He knew that goodwill exists only when there is an ongoing business, and he knew that Envision's marketable goodwill terminated long prior to Renfrow's bankruptcy filing.  He had no evidence to the contrary, and thus no good faith basis to believe that a postpetition transfer of goodwill occurred.

---

Envision had a duty to its patients to place the charts with another practitioner for their health and safety, which Renfrow, as Envision's only officer and shareholder, and as Envision's courier, fulfilled.

[103]If Grogan believed that Renfrow's prepetition disbursement of Envision's patient charts was an intentionally fraudulent transfer of Envision's assets, she had the opportunity to file a timely  adversary proceeding to assert that claim against Renfrow and challenge its dischargeability under § 523(a)(2) and/or (a)(6).   Because she sat on her rights, the UFTA claim with respect to the charts/goodwill was discharged.   Grogan learned of the uncompensated disposal of the charts at the same time as she learned of Renfrow's postpetition withdrawal of receivables, yet the UFTA claim she asserted in her Second Amended Petition was limited to postpetition withdrawals from Envision's bank accounts.  Grogan and AHN were well aware that Envision had no charts/goodwill to dispose of postpetition.

Nevertheless, Phipps represented to the jury that Renfrow "made a conscious decision to buy this practice for $100,000" and transferred this goodwill "away from her creditors."[104] While it is impossible to determine what value the jury assigned to goodwill in its general verdict – Phipps asked for $50,000, but he also argued Renfrow thought it was worth $100,000 – it is clear that the verdict was irreparably corrupted by Phipps' strategy to seek a judgment against Renfrow for transfers that occurred, if at all, prepetition.

Phipps testified to this Court that he had no reason to disagree that Envision closed in February 2017,[105] but claimed that Renfrow herself testified in the Grogan Action that she transferred the patient charts "during the course of her bankruptcy,"[106] *i.e.*, postpetition. The testimony Phipps relies upon, however, does not remotely support his position. Here it is:

> Q [by Phipps] Dr. Renfrow, those charts, all your patient charts, did you sell those charts and that goodwill of Envision when you went through your bankruptcy?
>
> A [by Renfrow] No.
>
> Q     You took possession of them and transferred them.
>
> A     Yeah. Patients had to have continuity of care. It was more about that. I didn't have time to assess a dollar value.[107]

The question Renfrow answered in the affirmative – "You took possession of them and transferred them" – did not include a time frame. Construing Renfrow's response as an

---

[104]Tr. Vol. III at 132-33.

[105]AP Trial Tr. at 121, 149, 216.

[106]Id. at 121.

[107]Tr. Vol. II at 263.

admission of a postpetition act ("when you went through your bankruptcy") is a conscious distortion of her testimony.

Phipps also claimed that he did not equate the patient charts with goodwill, implying that other elements of goodwill were transferred postpetititon.[108]  But in his closing argument, Phipps specifically identified Renfrow's "disposal" of the charts, the transfer of 80 Banker's boxes, as the act that constituted the fraudulent transfer of Envision's goodwill.[109]  He knew that act occurred prepetition and he had no evidence to the contrary.

C.     Grogan and AHN brought the UFTA claim as a vehicle for collecting the debt that Renfrow discharged, and they abused the system by seeking recovery of nonexistent postpetition transfers.

The Court further finds by clear and convincing evidence that Grogan and AHN aimed to deny Renfrow the benefit of her discharge by abusing the judicial system through harassment, concealment, misrepresentation, and trial by ambush.  Immediately after Renfrow's discharge was entered, and knowing that Envision had nothing of value to recover, Grogan and AHN resumed their lawsuit against Renfrow by filing the Second Amended Petition, which (1) reasserted discharged claims and (2) added the UFTA claim. While the UFTA claim originally sought funds Envision disbursed to Renfrow postpetition from Envision's bank accounts, it became clear shortly before trial that the UFTA claim was worth only $3,155.  Phipps and Grogan then redefined the scope of the UFTA claim without discovering any new facts, and without advising Renfrow or Brown.  While Renfrow and Brown defended the UFTA claim that was pled, Phipps and Grogan prosecuted undisclosed

---

[108]AP Trial Tr. at 217-30.

[109]Tr. Vol. III at 132-33.

theories of transfers and damages against Renfrow in the guise of establishing Envision's liability on the Loans.

For the first time, at closing, Phipps contended that Renfrow took control of all $76,000 of Envision's receivables, and failed to sell them to a collection agency for the benefit of Envision's creditors.[110]   Phipps placed a value of $40,000 on accounts that produced only $3,500 in collections.  He knew that Davis's spreadsheet showed that 72 percent of the receivables were over 90 days old.  He knew Envision sent final bills only to the patients that owed copayments or deductibles.  He knew that Envision could not afford to maintain its billing software, so no further billing was possible.  Yet he represented to the jury that Renfrow intentionally refused to collect $76,000 of receivables in order to defraud Grogan.

When asked to explain to this Court the factual basis Phipps had to support his representation to the jury that Renfrow personally "took control" of Envision's receivables, Phipps testified:   "[T]he maintenance, custody, and control of the accounts receivable through a specially created database that was tracking the accounts receivable, that was directing that any payments be, into a personal P.O. Box, and . . . by taking checks made out to Envision or made out to [Renfrow], which were payments of the accounts receivable, taking those and seeing that they were given to [Renfrow] personally, okay?  This is all post

---

[110]Id. at 132.  In fact, medical ethics discourages physicians from selling delinquent accounts to a collection agency or "enter[ing] into any arrangement under which the physician would lose complete control of the delinquent account or the method of its collection," because aggressive collection tactics "might bring the medical profession into disrepute and even destroy the 'good name' of the physician."  Oklahoma Medical Board Guide at 14-15.  See also AP Trial Tr. at 269-70.

bankruptcy. That information was known to me in advance of filing the UFTA claim. . . . Mr. Davis' 2004 exam was absolutely clear . . . on those facts."[111]

In fact, there was no "specially created database" that placed control of the receivables out of Envision's or its creditors' reach. Davis testified that Envision's bank statements, not his spreadsheet, would accurately reflect Envision's collection of receivables. Nor were patients directed to send payments to Davis's personal post office box. Envision's mail was forwarded by the post office to Davis's business P.O. box because Envision no longer had a physical place of business.[112] Nor did Davis testify that he took payments and saw that they were given to Renfrow personally. Instead, he testified that the payments were deposited into an Envision account. Phipps's testimony was self-serving and not credible.

Phipps knew that Renfrow was the sole officer of Envision and only she could control and collect accounts on behalf of Envision. The bank statements and check images confirmed that Renfrow, consistent with her duties to Envision, deposited Envision's collected receivables into Envision's bank accounts. When asked why Renfrow would deposit Envision's payments into Envision's account if Renfrow had already transferred the accounts to herself, Phipps stated "I can't answer that, but she took all the money from the account and gave it to herself, anyway."[113] Yes, that happened, but only to the extent of $3,155. Phipps could not point to *any* evidence in support of his argument that Renfrow was a "transferee" of the whole of Envision's accounts receivable. Printing out a list of potential

---

[111]AP Trial Tr. at 186-87.

[112]Defendants' Exhibit 153 at 18-19.

[113]AP Trial Tr. at 194.

receivables is not a transfer.  All evidence supports a finding that Envision *still owned* its accounts receivable at the time of the Grogan Action trial.

Nevertheless, Grogan and AHN created, and sold to the jury, the false narrative that Envision transferred receivables worth $40,000 to Renfrow personally in order to defraud Grogan.  These statements had no basis in fact, and were intended to have the "objective effect" of rendering Renfrow personally liable for as much of the Purchase Money Loan, the Bridge Loan, and the Operational Loans – debts she discharged –  as possible.

Moreover, throughout the jury trial, Phipps painted Renfrow as a person unworthy of her discharge. He belittled her for filing bankruptcy and demeaned the bankruptcy process. He suggested that she was not broke, did not need to file bankruptcy, and did so out of spite.[114]  Although Grogan *never challenged Renfrow's discharge in the bankruptcy case*, Phipps badgered Renfrow before the jury to create the impression that Renfrow filed bankruptcy and obtained her discharge in bad faith to defraud Grogan.

> Q [by Phipps]  [Y]ou swore under oath to the federal bankruptcy court and to your creditors that there was a valid obligation, a liability, between – of you and Envision for ongoing equipment loans and operational loans made in 2014 and 2015.
>
> A [by Renfrow] I don't agree totally with that because I don't know why the money was transferred and I certainly never agreed to it, but I did want to cover myself with a liability.
>
> Q      Ah-ha, yeah.  You wanted to escape personal liability on it so you declared it as a valid loan; right?
>
> A      I listed anything and everyone that could be a creditor.

---

[114]Tr. Vol. II at 244-51, 247-51, Tr. Vol. III at 43-47, 88.

Q      And therefore, you're telling the jury that Envision owes it or Envision doesn't owe it?

A      I don't know how to answer that.

Q      Well, let me give you a clue, Dr. Renfrow.  When you said that this is a debt that you're going to be discharged from personally of you and Envision, then Envision still owes it, though you get off the hook.

A      That is how this bankruptcy works.

Q      That's right.  So can we have an agreement between you, me and the jury, that of this third claim against Envision, you concede you owe no less than $64,300 of it?

A      I don't.  Envision does.

Q      Oh, of course.   You – you're discharged from it.

A      That's correct.

Q      But Envision is not.

A      No.

Q      For how long before March of 2017 had you realized that you would file  bankruptcy and plan for it?

A.      It wasn't a long time. . . .

                              *****

Q      [W]ould you confirm that in mid-2016 - it was June 16th of 2016 - you texted Carrie Pettigrew, said, "I'm declaring bankruptcy . . . and moving on, but I have the satisfaction that you didn't screw one more person."

A      Unfortunately, yes, I would have to admit that that did happen.

Q      Now, would you also confirm that you sent a Facebook posting to Courtney's sister Lauren, declaring that you were going to bankrupt them?

A      It was on my mind.  I hadn't made any formal plan.

Q      Would you confirm that you posted on Facebook to Lauren, "I'm going to declare bankruptcy.  I wish I'd never heard of your family or Carrie Pettigrew.  You all ruined my life."

A      That would probably be an accurate statement at that point.

Q      "Buying your dad's practice was the worst mistake I ever made, not worth it.  Hope you guys like having Carrie around.  I'm going to declare bankruptcy."

A      It was always on my mind. We were living month-to-month, week-to-week and constantly being drug into court by you.[115]

Also:

Q [by Phipps] One of the things that was owned by Envision . . . all that equipment . . . that McAlester had leased to you . . . [w]here did it all go?

A [by Renfrow] Well, I spent over $150,000 on that equipment and it went back to the hospital because they still owned it.  I didn't get to pay it off.

Q      Right. They, because you had stopped paying, they came and they repossessed it; right?

A      Correct.

Q      When did they do that?

A      That would have to be – I don't know the exact date but towards the end of February.

Q      You don't know the exact date because you weren't there.

A      That's right.  I had stopped seeing patients.

Q      You stopped going to the office.  There was nobody there, was there?

A      Well, of course not.  We cleaned it out.

Q      That's right. You had left, left the landlord the keys or at least maybe under the mat and had gone away.

_____

[115]Tr. Vol. II at 212-16.

A      No. I talked to him.  He knew the situation.

Q      And you bankrupted, personally, him also, didn't you?

A      I didn't have a choice.[116]

Also:

Q [by Phipps] And when you declared bankruptcy and left Envision out of the bankruptcy with its assets out of the bankruptcy. . . .

Brown: Objection, Your Honor.  That's a misstatement.  It was not left out of the bankruptcy.  It's unfair for him to say so. . . .[117]

*****

Q [by Phipps] Now when you filed bankruptcy, you certainly would agree that Envision was not able to pay its debts when they came due.

A [by Renfrow] It was not.

Q      But you chose not to file bankruptcy with Envision; isn't that correct?

A      It wasn't an option.

Q      Isn't that correct?

A      That's correct.

Q      All right.  Now, you did understand that if you filed bankruptcy with Envision also, that the Envision assets would be turned over to a trustee so that the trustee could manage them and distribute it among the creditors.  That's how you understood it would work.

A      Yes.

Q      But if you didn't file bankruptcy with Envision, its assets would not be turned over to the trustee, but they would still be out there as Envision's.  Is that how you understood it?

_____

[116]Tr. Vol II at 220-21.

[117]Tr. Vol. II at 252-53.

40

A      No, it's not.[118]

Phipps accused Renfrow of taking and disposing of Envision's hard assets – equipment and furniture – for the first time in closing argument. Referring to the 2014 depreciation schedule, he argued –

> And then there's the equipment.  On the amortization table . . . the office furniture. . . . She carries this on her books at $31,000.  Now, this is a depreciation schedule.  It is some evidence, though, of its value. . . .  She's carrying medical equipment on her books of $55,000.  So that's 80 some thousand dollars she's carrying on her books as the value of her furniture and equipment.  Now, this is a couple of years before her bankruptcy and the transfers, but she now says she attributes no value whatsoever. . . .

> We have evidence that there's significant equipment value.  She had possession of it at the time of her bankruptcy that she – when she closed her practice and that it is gone.  We have evidence that it's carried on her books at a significant value.  I'm asking that you make a $30,000 attribution for the value of the equipment that she took away from the possibility of the creditors taking and selling so they could help pay down their debt.[119]

From Renfrow's Rule 2004 exam testimony, Phipps knew that whatever equipment and furnishings Envision owned on the petition date was in Renfrow's garage, which Grogan could have recovered at any time.[120]  Phipps knew that Renfrow did not hide Envision's equipment from its creditors.  It is no wonder Renfrow and Brown were surprised when Phipps asked the jury to award $30,000 in damages for old and worthless equipment that *still*

---

[118]Tr. Vol. II at 216-17.

[119]Tr. Vol. III at 133-34.

[120]Defendants' Exhibit 106 at 90 (Renfrow stated that the medical equipment that secured the debts was "in my garage and you're welcome to get [it]"); Tr. Vol. II at 219-20 (In response to Phipps' question about the value of Envision's equipment and furnishings at the time of her bankruptcy, Renfrow stated: "Unknown because it was all Joe Cole's stuff that you wouldn't come get out of my garage. . . . [assets owned by Envision] [t]hat we tried to give you.").

*belonged to Envision* and that Grogan never even tried to recover. Again, Phipps manufactured transfers – and asserted without evidence that they were made postpetition – in order to impose liability on Renfrow for debts that she had discharged.

At trial before this Court, Brown asked Phipps why he did not seek to recover the actual accounts receivable and equipment from Envision rather than pursuing a money judgment from Renfrow.[121]  Phipps claimed that he did not think he could have repossessed the equipment because he "did not have signed transaction documents" and Renfrow had denied the authenticity of the documents.[122]  He also blamed non-perfection of the security interest, which, as a matter of law, was irrelevant to enforcing the security agreement against Envision.[123]  He further claimed he did not have a factual basis to pursue the assets,[124] notwithstanding that in the Second Amended Petition, he attached and referred to the Security Agreement and asked for possession of and right to sell the collateral.[125]  It is obvious that Grogan did not want the assets – she knew they were worthless.  Instead she

---

[121]AP Trial Tr. at 146.

[122]Id.

[123]Id.  The Court finds that argument specious.  First, it is hornbook law that a security agreement that meets the provisions of § 9-203 of the Uniform Commercial Code is a valid and enforceable contract between the parties.  See White, Summers, & Hillman, Uniform Commercial Code § 31:2 - 31:3 (6th ed.).  "[T]he failure to perfect a security interest affects only the priority of the claim [as against third parties], not its validity."  Farm Credit Services of America, Inc. v. Wilson, 2011 OK CIV APP 14, 247 P.3d 1199, 1201.  Second, Phipps and Grogan knew that Renfrow was willing to turn over Envision's property to Grogan without any further legal action.

[124]AP Trial Tr. at 147.

[125]Defendants' Exhibit 112 at ¶ 13.

sought a money judgment against Renfrow, which had the objective, practical effect of reimposing liability on Renfrow for the discharged Loans.  The UFTA claim was, indeed, a ruse to collect discharged debt.

>D.   Damages

Renfrow did not enter into bankruptcy lightly. The time, cost, and stress of the ongoing litigation with Grogan and Pettigrew, coupled with contentious divorce and custody proceedings, depleted both Renfrow and Envision.  Overwhelmed by debt from a failed business, Renfrow filed her bankruptcy petition in good faith.  Her case was routine and uneventful.  The Chapter 7 trustee was satisfied with her disclosures, no objections to discharge were filed, and a discharge was granted in the ordinary course.

Renfrow was an "honest debtor" entitled to be "relieve[d] . . . [of] the weight of oppressive indebtedness, and permit[ted] . . . to start afresh free from the obligations and responsibilities consequent upon business misfortunes" and entitled to "a new opportunity for life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."[126]  Grogan and AHN deprived Renfrow of these benefits.

Renfrow has suffered emotional distress, beginning in August 2017 and continuing to date.  Grogan's Judgment for intentional fraud is detrimental to Renfrow's reputation. Renfrow's abusive husband used the judgment as ammunition in their divorce and custody case, and disclosed it to their children and their son's guardian ad litem.[127]  The existence of the Judgment has discouraged Renfrow from applying for permanent employment.  She

---

[126]Local Loan v. Hunt, 292 U.S. 234, 244 (1934).

[127]AP Trial Tr. at 269.

testified: "I've taken temporary jobs and have done really well, terrified though, of applying for a permanent position because they do extensive background checks. This will come up and having to explain it, I don't even know how to put this into words."[128]  Also, "I worry all the time about where I work and what, you know, if they find out.  And who's going to even believe that something like this can happen."[129]  Instead of being able to "start afresh," Renfrow has been consumed by fear, anxiety, and stress. "This has been a nightmare."[130]

Grogan and Phipps were well aware that Renfrow was financially and emotionally vulnerable when they determined to sue her anew. Renfrow immediately sought counseling when she learned that Grogan intended to continue the lawsuit.  She testified:

> I had a counselor lined up for my son if he had gotten to move with me and then I wound up seeing the counselor, myself, and half the time was talking about my divorce proceedings, half the time was . . . talking about the lawsuits. It's hard to tease those out because they would all collaborate together, meaning my ex, who has a five-year protective order, [Grogan] would call as her witness in the state court proceedings.  He would call [Pettigrew] as his witness. [Pettigrew] would call him as [her] witness.[131]

Davis testified that Renfrow is fearful, feels "targeted," and has gotten physically sick in advance of court proceedings because AHN, Grogan, Pettigrew, and Renfrow's husband continue their heavy-handed litigation tactics notwithstanding her discharge.[132] Having reviewed the entire record of the Grogan Action, and having observed Renfrow's demeanor

---

[128]Id.

[129]Id.

[130]Id. at 273.

[131]Id. at 272.

[132]Id. at 322.

at trial, the Court easily finds that Renfrow has suffered severe emotional distress, such distress a natural reaction to Grogan's egregious disregard for Renfrow's right to be left alone after properly and legitimately discharging her debts.

Renfrow also incurred fees and expenses defending against the claims asserted in the Second Amended Petition from August 16, 2017, through April 17, 2018, in the amount of $17,306.00,[133] and fees and expenses reasonably incurred in prosecuting her violation of discharge claim from August 21, 2017, through November 30, 2018, in the amount of $37,561.36.[134]

The Court further finds by clear and convincing evidence that Grogan and AHN knowingly violated Renfrow's discharge, or at a minimum, acted "with reckless disregard" as to Renfrow's "federally protected right[s]" that accrued upon obtaining a discharge.[135] They falsely suggested throughout the Grogan trial that Renfrow was not in financial distress when she filed bankruptcy, and that she discharged debts to Grogan in bad faith. They

---

[133]Renfrow Exhibit 49A.

[134]Renfrow Exhibits 49A, 49B, 49C, 49D, and 49E.  The Court finds the total fees incurred by Renfrow in this Adversary Proceeding to be extremely reasonable in light of the vigorous defensive tactics employed by Grogan and AHN.  See Docket Sheet, Defendants' Exhibit 139 ( Defendants' Motion to Dismiss Adversary Complaint and Brief in Support, and Reply (Docs. 19 and 21); Defendants' Response and Objection to Plaintiff's Application to Amend Complaint (Doc. 27); Defendants' Motion to Strike Plaintiff's Emotional Distress Claim or, Alternatively, Motion to Compel & Brief in Support (Doc. 42); Defendants' Motion for Summary Judgment, Brief in Support, and Reply (Docs. 43, 44, 54); Defendants' Motion to Disqualify The Honorable Dana Rasure (Doc. 69); Defendants' Motion to Disqualify Ron Brown as Counsel for Plaintiff (Doc. 70); Defendants' Motion in Limine (Doc. 84); Defendants' Trial Brief (Doc. 85)).

[135]Ridley v. M&T Bank (In re Ridley), 572 B.R. 352, 365 (Bankr. E.D. Okla. 2017) ("[W]here a creditor knew of a debtor's federally protected right and acted intentionally or with reckless disregard of that right, an award of punitive damages may be justified.").

misled Renfrow and Brown as to the extent of the UFTA claim, and blatantly misrepresented to the jury that the conduct for which they sought compensation all occurred after Renfrow filed for bankruptcy. They enlisted Renfrow's abusive husband to testify against her and Envision. In sum, Grogan and AHN plotted to collect discharged debt, and proceeded with deception, malice, and callousness, and with utter disregard for § 524(a)(2) of Bankruptcy Code and the order of this Court that enjoined them from such behavior.

## III.    Conclusions of law

A discharge entered under § 727 "discharges the debtor from all debts that arose before the date of the order for relief."[136]   Section 524(a)(2) describes the effect of the discharge; it provides that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived."[137]  "The discharge injunction arises by operation of law upon entry of the discharge" and "'is an equitable remedy precluding the creditor, on pain of contempt from taking *any* actions to enforce the discharged debt.'"[138]

In the event the discharge injunction and possibility of contempt fails to restrain a creditor from suing a debtor to collect a discharged debt, the Bankruptcy Code provides that any judgment that imposes *in personam* liability on the debtor for a discharged debt is void

---

[136]11 U.S.C. § 727(b). The commencement of a voluntary case "constitutes an order for relief[.]" 11 U.S.C. § 301(b). The date of the order for relief herein was March 10, 2017.

[137]11 U.S.C. § 524(a)(2).

[138]Hambrick v. Perceptual Dev. Corp. (In re Hambrick), 481 B.R. 105, 113 (Bankr. E.D. Okla. 2012) (citation omitted).

*ab initio.* Section 524(a)(1) "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 . . . whether or not discharge of such debt is waived."[139]

Under § 105(a), bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.[140]   In addition, bankruptcy courts may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."[141]   Thus, bankruptcy courts have broad equitable powers "to enforce and remedy violations of substantive provisions of the Bankruptcy Code, including in particular the discharge injunction in § 524(a)(2)."[142]   Courts may issue any order or judgment to give effect to the discharge injunction, and may impose monetary sanctions against a creditor that acted in contempt of the injunction.  If a creditor acts in clear disregard or disrespect of bankruptcy law, or if its conduct was egregious, vindictive, or malicious in nature, punitive damages may be imposed.[143]

---

[139]11 U.S.C. § 524(a)(1).

[140]11 U.S.C. § 105(a).

[141]Id.

[142]Paul v. Iglehart (In re Paul), 534 F.3d 1303, 1306 (10th Cir. 2008).  The Tenth Circuit goes on to say that such power "cannot be exercised contrary to or in excess of the terms of the substantive Code provision being enforced."  Id. at 1307.

[143]See Ridley, 572 B.R. at 364-65; Culley v. Castleberry (In re Culley), No. NM-05-105, 2006 WL 2091199, at *4 (B.A.P. 10th Cir. July 24, 2006).  See also Cherry v. Arendall (In re Cherry), 247 B.R. 176, 189-90 & n.23 (Bankr. E.D. Va. 2000), and cases cited therein.

"To hold a party in contempt, the burden rests with the movant to show by clear and convincing evidence that the creditor (1) had actual or constructive knowledge of the discharged debt and (2) *intended the actions which were taken* in violation of the injunction."[144]  The debtor need not prove that the creditor subjectively intended to violate the discharge or acted in bad faith.[145]

In addition, "[n]otwithstanding the facial permissibility of a lawsuit or some other action taken by a creditor vis a vis a discharged debtor, a violation of § 524(a)(2) may still be found if the debtor proves the creditor acted in such a way as to 'coerce' or 'harass' the debtor improperly, *i.e*., so as to obtain payment of the discharged debt."[146]  "The inquiry is objective; the question is whether the creditor's conduct had the practical, concrete effect of coercing payment of a discharged debt, and bad faith is not required."[147]  The debtor must "prove not merely that [the creditor's] act is not what it appears to be, but that the act in question is one to collect a discharged debt *in personam*."[148]

    A.    <u>Defendants' conduct violated § 524(a)(2) and the Court's discharge order</u>.

           *1.    The filing of the Second Amended Petition constituted a continuation of an action to collect prepetition debt.*

---

[144]<u>Peyrano v. Sotelo (In re Peyrano)</u>, 558 B.R. 451, 457 (Bankr. E.D. Okla. 2016) (citations omitted and emphasis added).

[145]<u>Id</u>. at 459; <u>In re Slater</u>, 573 B.R. 247, 256 (Bankr. D. Utah 2017).

[146]<u>Paul</u>, 534 F.3d at 1308 (quotations and citations omitted).

[147]<u>Id</u>. (citations omitted).

[148]<u>Id</u>., *quoting* <u>In re Schlichtmann</u>, 375 B.R. 41, 97 (Bankr. D. Mass. 2007).  <u>See also Green Point Credit, LLC v. McLean (In re McLean)</u>, 794 F.3d 1313, 1321-22 (11th Cir. 2015).

Grogan and AHN had actual knowledge that Grogan's contract and unjust enrichment claims were discharged, yet Grogan authorized AHN to file an amended petition that, on its face, continued to seek damages from Renfrow on those discharged claims. No reasonable person or lawyer could conclude, from reading the Second Amended Petition, that the breach of contract and unjust enrichment were asserted solely against Envision; the prayer for relief requested a judgment against both Envision and Renfrow.[149]  Renfrow was forced to hire counsel to answer the Second Amended Petition, and to seek dismissal of the discharged claims, which turned out to be a more difficult task than it should have been. The Second Amended Petition was filed in contempt of the discharge injunction and this Court's discharge order.

2.    *Defendants' conduct in pursuit of the UFTA claim violated the discharge injunction.*

Defendants also violated the discharge injunction by stealthily pursuing collection of the discharged Loans under the veneer of a UFTA claim that was facially limited to recovering receivables Envision collected postpetition. Before and after dismissing the contract and unjust enrichment claims, and throughout the trial on the Grogan Action, AHN

---

[149]Imprecise pleading that leaves a discharged debtor guessing whether the creditor seeks to collect discharged debt is sufficient to warrant sanctions for contempt. See, e.g., Hambrick, 481 B.R. at 111, 115-16 (post-discharge amended complaint filed against debtor was "virtually identical" to the original complaint and did not clearly limit damages to postpetition conduct and debts, but rather "appear[ed] to have been drafted to allow [creditors] as much flexibility as possible with which to structure any type of damage claim and remedy for any time period they wish to pursue"); In re Kabiling, 551 B.R. 440 (B.A.P. 9th Cir. 2016) (in a petition to quiet title against numerous defendants, including debtors who surrendered the property, the creditor's request for attorney fees did not clearly exclude debtors; even though creditor did not intend to seek fees from debtors, the petition violated the discharge injunction, warranting a finding of contempt and imposition of sanctions).

repeatedly represented to Renfrow, Brown, and the trial court that Grogan did not and would

not seek recovery on discharged claims, *i.e.*, prepetition transfers.  Then, Phipps did *just that*

in closing argument.  Phipps directed the jury to award Grogan damages for allegedly

transferring Envision's goodwill/charts and hard assets, events that Phipps and Grogan knew

from the Rule 2004 examinations occurred, if at all, prepetition, and they had no basis to

believe otherwise.

In their Trial Brief, Defendants now attempt to justify their violation by arguing – for

the first time – that all the alleged transfers were "deemed" to have occurred on August 1,

2017, the date the Second Amended Petition was filed, which was "clearly post

bankruptcy."[150]  For this dubious proposition, they cite Section 118 of Oklahoma's UFTA.[151]

At trial to this Court, Phipps explained:  "[F]or the purposes of the entire UFTA, the date of

transfer is the date on which . . . the transfer is perfected, okay?  And if there is no evidence

---

[150]Defendants' Trial Brief at 20.

[151]Section 118 states, in relevant part:

For the purposes of the Uniform Fraudulent Transfer Act:

A transfer is made . . . with respect to an asset that is not real property or that
is a fixture, when the transfer is so far perfected that a creditor on a simple
contract cannot acquire a judicial lien otherwise than in accordance with the
provisions of the Uniform Fraudulent Transfer Act that is superior to the
interest of the transferee.

If applicable law permits the transfer to be perfected as provided for in
paragraph 1 of this section and the transfer is not so perfected before the
commencement of an action for relief pursuant to the provisions of the
Uniform Fraudulent Transfer Act, the transfer is deemed made immediately
before the commencement of the action.

24 O.S. § 118(1)(b) and (2).

of perfection, it's deemed to be the date of the petition.  August 1, 2017 is the date of the [Second Amended Petition].  That's statutory."[152]

Section 118 is not relevant to determining whether a claim is a prepetition debt that is discharged under § 727(b), however.  Although state law provides the elements of a state law claim, "federal law determines whether such claim arose prepetition or postpetition."[153] In the Tenth Circuit, a claim arises prepetition for the purposes of discharge if the *conduct* that gave rise to the liability occurred prepetition, even if state law provides otherwise.[154]  In order to provide debtors with the broadest possible relief under § 727(b), the Bankruptcy Code defines a "debt" as "liability on a claim,"[155] and defines "claim" as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"[156]  An unmatured, unliquidated, or contingent claim that is based on *conduct* that occurred prepetition is discharged, even if state law provides that the claim does not accrue until a later date.[157]

---

[152]AP Trial Tr. at 181-85.

[153]Kabiling, 551 B.R. at 447.

[154]See In re Parker, 264 B.R. 685 (B.A.P. 10th Cir.), *aff'd,* 313 F.3d 1267 (10th Cir. 2002). See also In re Egleston, 448 F.3d 803, 812-13 (5th Cir. 2006); Kabiling, 551 B.R. at 447; In re Moreno, 479 B.R. 553, 564 (Bankr. E.D. Cal. 2012).

[155]11 U.S.C. § 101(12).

[156]11 U.S.C. § 101(5)(A).

[157]See Parker, 264 B.R. at 697 ("[T]he issue of whether a claim is valid under state law is not the primary inquiry for a bankruptcy court when determining whether a claim against a debtor is a bankruptcy claim under the Code. The central issue for a bankruptcy court is

Grogan and Phipps knew that, except for the postpetition collection of receivables, the conduct they argued constituted "transfers" occurred prepetition – they had zero evidence to the contrary. Claims against Renfrow that were based upon acts performed in connection with discontinuing her practice in January 2017 and closing Envision's office in February 2017 were discharged. To argue that Oklahoma law transformed discharged prepetition claims into valid postpetition UFTA claims is absurd on its face, and underscores Defendants' continuing disregard of Renfrow's rights under the Bankruptcy Code.

3.    *Renfrow established that Defendants schemed to collect the Loans from Renfrow through the spurious UFTA claim.*

Notwithstanding the facial permissibility of seeking a judgment against Envision for nonpayment of the Loans, and the facial permissibility of asserting a claim against Renfrow for postpetition conduct, this Court is convinced that Defendants pursued the UFTA claim with the goal of imposing personal liability on Renfrow for discharged debts. They misled Renfrow and Brown as to the scope of the UFTA claim, and blindsided them after the close of evidence by arguing Renfrow conveyed $120,000 worth of Envisions's assets to herself. Phipps invented this story to supply jurors with the means to encumber Renfrow personally for a substantial amount of Envision's liability on the Loans. Phipps's improper conduct had the "practical, concrete effect" of making Renfrow liable on the Loans that she discharged.[158]

---

whether a claim *as defined by the Bankruptcy Code* existed pre-petition. We find that pursuant to the plain language of the statute, a claim will exist if some pre-petition conduct has occurred that will give rise to liability." (Emphasis added)).

[158]Paul, 534 F.3d at 1308.

The plan to make Renfrow again personally liable for the Loans was hatched immediately after Renfrow's discharge.  The June 22nd email from Phipps to Grogan establishes that they discussed Renfrow's discharge, the futility of seeking recovery on the Loans from Envision, and the possibility of recovering the receivables Renfrow admitted to withdrawing from Envision postpetition for living expenses.  They did not bother to discover how much Envision collected postpetition before alleging that Renfrow fraudulently transferred "substantial assets from [Envision's] bank accounts."[159]

The UFTA claim allowed Grogan to harass Renfrow by embroiling her once again in the Grogan Action.  The continued litigation was motivated by ill will and spite rather than the facts on the ground, and furthered a "covert agenda"[160] to collect Envision's debt on the Loans from Renfrow by any means.  Grogan had no interest in Envision's actual assets, nor did she accept Renfrow's offer to pay her the amount of postpetition withdrawals shown on Envision's bank statements.  Grogan preferred going to trial, where Phipps was able to harass and belittle Renfrow, suggest that her bankruptcy was filed in bad faith, and that she did not deserve to discharge the Loans, notwithstanding that *no one* had challenged her right to a discharge in this Court.  In impugning the legitimacy of Renfrow's discharge, Phipps impugned the entire bankruptcy process and the court that granted the discharge.

In his closing argument, Phipps fabricated out of whole cloth transfers from Envision to Renfrow, and with a stunning lack of candor, stated and/or implied that such transfers

---

[159]Defendants' Exhibit 112 at 4.

[160]<u>Paul</u>, 534 F.3d at 1312.

53

occurred postpetition.  By violating the federal statutory injunction against attempting to collect prepetition debts, Defendants turned the UFTA claim worth, at most, $3,155 into a judgment requiring Renfrow to repay Grogan $89,500 of the discharged Loans.

B.    The Judgment is void.

Under § 524(a)(1) of the Bankruptcy Code, a discharge –

> (1) *voids any judgment at any time obtained*, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 . . . whether or not discharge of such debt is waived.[161]

The plain language of § 524(a)(1) renders judgments that impose personal liability on a debtor for discharged debt void.  The statute is self-executing and applies to any judgment, entered prepetition or postpetition, that purports to impose liability for discharged debt.  Such a judgment is void by operation of law.[162]

The legislative history indicates that § 524(a) was enacted to address –

> a perceived abuse arising from the former status of a bankruptcy discharge as merely creating an affirmative defense that was waived if not affirmatively pleaded and proved in postbankruptcy litigation. . . . Congress was expressly making it possible for a discharged debtor to ignore a creditor's subsequent action in a nonbankruptcy court.[163]

---

[161] 11 U.S.C. § 524(a)(1) (emphasis added).

[162] See, e.g., Egleston, 448 F.3d at 809, 815 n.15. "Congress has not provided bankruptcy courts with the general authority to annul state court orders.  Instead, section 524(a) . . . 'voids any judgment . . . to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727.'" Id. at 809.

[163] In re Pavelich, 229 B.R. 777, 781 (B.A.P. 9th Cir. 1999), citing legislative history of the 1970 amendments to § 14*f* of the Bankruptcy Act.  See also In re Cruz, 254 B.R. 801, 810 (Bankr. S.D.N.Y. 2000).

Defendants argue that once Renfrow asserted her discharge in defense of the Second Amended Petition, Renfrow had, under Oklahoma's rules of civil procedure, the burden of proving in state court that the debt Grogan sought to be collected was discharged.  The Bankruptcy Code says otherwise.  "The affirmative nature of the defense of discharge in bankruptcy . . . was effectively outlawed in 1970.  It became an absolute defense that relieved a discharged debtor from the need to defend a subsequent action in state court."[164]  Thus, while Defendants blame Renfrow and her counsel for not anticipating that Grogan would claim Renfrow fraudulently transferred $120,000 worth of Envision's assets, and for not introducing evidence at trial to prove that any such transfers were made prepetition, a discharged debtor is not required to prove anything to preserve her discharge.

> The legislative history of § 524(a) shows that it was enacted to prevent debtors from having their discharge nullified by post-bankruptcy collection efforts in state court. . . . "[T]he injunction [under § 524(a)(2)] is to give complete effect to the discharge and to eliminate any doubts as to the effect of the discharge as a total prohibition on debt collection efforts." [In re ]Walker, 180 B.R. [834,] 842 [(Bankr.W.D.La.1995)] (quoting House and Senate reports). The Bankruptcy Code does not show that Congress intended to qualify or limit the injunction under § 524(a)(2) based *on the extent of a debtor's efforts to defend in state court.* See In re Dabrowski, 257 B.R. 394, 407 (Bankr.S.D.N.Y.2001) (noting that a debtor's participation in state court is not a consideration in the application of § 524).[165]

Section 524(a)(2) and this Court's discharge order categorically enjoined Grogan from collecting discharged debts.  As the enjoined party, Grogan bore the risk of violating the

---

[164]Pavelich, 229 B.R. at 781; In re Meadows, 428 B.R. 894, 904-06 (Bankr. N.D. Ga. 2010).

[165]In re Kewanee Boiler Corp., 270 B.R. 912, 919-20 (Bankr. N.D. Ill. 2002) (emphasis added).

injunction.  She and her counsel had the burden, and the duty, before asking the jury to impose personal liability on Renfrow, to ascertain whether the conduct supporting the claim occurred prepetition or postpetition.  Phipps had a duty to abstain from asking, in closing argument, for damages for transfers that happened, if at all, prepetition.[166]

As Congress intended, Section 524(a)(1) *statutorily* defends Renfrow's discharge by voiding offending judgments.  Because Grogan obtained the Judgment imposing personal liability on Renfrow for claims that arose, if at all, prepetition, such claims were discharged under § 727(b) and the Judgment is void.[167]

    C.      Defendants' defenses are meritless.

        1.      *Rooker-Feldman*

Defendants contend that the Court lacks subject matter jurisdiction over this Adversary Proceeding under the Rooker-Feldman doctrine.  The Rooker-Feldman doctrine "precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in [a lower]

---

[166]In re Gurrola, 328 B.R. at 174-75 ("a creditor has a duty to obey the discharge injunction," and debtors do not have the burden of raising, proving, or otherwise preventing creditors from violating the discharge).  "[D]ischarge in bankruptcy is . . an absolute, nonwaivable defense.  Since 1970, it has not been an affirmative defense."  Id. at 170.  See also Wohleber v. Skurko (In re Wohleber), 596 B.R. 554, 572-73 (B.A.P. 6th Cir. 2019) (creditors, not debtor's counsel, had a duty to take affirmative action in state court to prevent collection activity in violation of the automatic stay).

[167]Gurrola, 328 B.R. at 171 (a judgment imposing personal liability for discharged debt is "'void' the instant it [is] entered").  See also Pavelich, 229 B.R. at 782; Slater, 573 B.R. at 257; Meadows, 428 B.R. at 909-10; Cruz, 254 B.R. at 810-11.

federal court."[168] The doctrine is based on 28 U.S.C. § 1257, which dictates that the United States Supreme Court is the only federal court with appellate jurisdiction to modify or reverse final state court judgments. This Court has jurisdiction to determine whether Rooker-Feldman applies to this Adversary Proceeding.[169]

> a.   Rooker-Feldman is inapplicable where state and federal courts have properly assumed concurrent jurisdiction on the same or related matter.

Renfrow commenced this Adversary Proceeding seeking to hold Defendants liable for violating her discharge *prior* to the entry of the Judgment. The Rooker-Feldman doctrine does not strip a federal court of properly-assumed jurisdiction if a state court thereafter enters a judgment on the same or related question. In Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,[170] the United States Supreme Court held:

> When there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." [Citations omitted]. Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. [Citations omitted]. But neither Rooker nor Feldman supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court.

---

[168]Gray v. Nussbeck (In re Gray), 573 B.R. 868, 875 (Bankr. D. Kan. 2017), *quoting* In re Miller, 666 F.3d 1255, 1261 (10th Cir. 2012).

[169]"[A] federal court always has jurisdiction to determine its own jurisdiction." Petrella v. Brownback, 697 F.3d 1285, 1292 (10th Cir. 2012), *quoting* United States v. Ruiz, 536 U.S. 622, 627 (2002).

[170]544 U.S. 280 (2005).

Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law. The Full Faith and Credit Act, 28 U.S.C. § 1738 . . . requires the federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." [Citations omitted].  Preclusion, of course, is not a jurisdictional matter. See Fed. Rule Civ. Proc. 8(c) (listing res judicata as an affirmative defense). In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court.[171]

Defendants argue that "the requisite 'parallel litigation'" terminated prior to the entry of the Judgment when Defendants dismissed the contract and unjust enrichment claims three months before trial of the UFTA claim.[172] They contend that it was only after the entry of Judgment that Renfrow amended her Complaint to assert that Defendants' prosecution of the UFTA claim also violated the discharge.[173]  Because there was never parallel litigation concerning the propriety of the UFTA claim, they argue, Renfrow, as a "state court loser" on the UFTA claim, cannot seek relief from the Judgment in this Court.[174]

Renfrow's original Complaint, however, alleged not only that the reassertion of the contract and unjust enrichment claims violated her discharge, but also that the UFTA claim "appears to create a new cause of action based on post-discharge conduct, *but is, rather, a ruse to continue litigation against Plaintiff* and to bootstrap the monetary claims previously

---

[171]Id. at 292-93.

[172]Defendants' Trial Brief at 7.

[173]Id. at 5-8.

[174]Id.

alleged."[175]  In her original prayer, Renfrow requested a determination that *all* debts owed to Grogan had been discharged, and an order requiring a *complete dismissal* of Renfrow from the Grogan Action.[176]  After trial and entry of the Judgment, Renfrow simply amended the Complaint to provide specific instances of conduct in support of her original assertion that the UFTA claim was a "ruse" to collect discharged debt.[177]

> b.      The Judgment is not final.

Renfrow has appealed the Judgment to the appropriate state appellate court.  The Judgment is not final, and in contesting the appeal, Defendants are continuing their efforts to collect discharged debt.  Accordingly, as in Exxon, the state and federal proceedings on related matters continue to proceed simultaneously, and this Court is not deprived of jurisdiction under Rooker-Feldman.

> c.      Renfrow seeks sanctions for discharge violations in connection with the Judgment.

This Adversary Proceeding is not an ersatz appeal.  Renfrow has appealed the merits of the Judgment to the Oklahoma Supreme Court.  That appeal, however, does not preclude this Court from enforcing Renfrow's discharge by sanctioning conduct committed in contempt thereof.

---

[175]Renfrow Exhibit 26 at 4, ¶ 19 (emphasis added).

[176]Id. at 8-9.

[177]Renfrow Exhibit 41 at 8-11.

d.    <u>Flanders</u> is distinguishable.

Defendants rely on an unpublished Tenth Circuit decision, <u>Flanders v. Lawrence (In re Flanders)</u>,[178] for the proposition that this Court lacks jurisdiction to determine whether their UFTA claim included discharged debt.  <u>Flanders</u>, however, is (1) not binding precedent; (2) distinguishable on its facts; and (3) otherwise supports Renfrow's position that <u>Rooker-Feldman</u> does not deprive the Court of jurisdiction to enforce and vindicate Renfrow's discharge.

In <u>Flanders</u>, the debtor's bankruptcy estate ended up with a substantial surplus, which was to be distributed to the debtor, Flanders.  Flanders' estranged spouse claimed that the surplus was marital property, however, and the bankruptcy court deferred to the state court where the parties' divorce was pending to determine the scope of marital property.  The divorce court declared the surplus to be marital property, and in a decree, divided the marital property accordingly.  In the divorce court, Flanders argued that his spouse's claim to the surplus was precluded by his discharge.  After exhausting his state court appeals, Flanders brought an eleven-count adversary proceeding in bankruptcy court, asserting that the divorce court erred in finding the surplus to be marital property, and asked the bankruptcy court to, among other things, declare the property division void.  He also sought damages from his spouse and her attorneys for violating the discharge injunction.

The Tenth Circuit concluded that Flanders's request to declare the property division void on the grounds that the state court erred regarding the scope of his discharge was

---

[178] 657 Fed.Appx. 808 (10th Cir. 2016).

precluded by <u>Rooker-Feldman</u>.  Other claims, however, including "issuance of contempt and

sanctions for pursuing claims discharged in bankruptcy court, and injunctions against further

collection efforts based on claims discharged in bankruptcy court," while inconsistent with

the state court judgment, did not trigger the <u>Rooker-Feldman</u> doctrine.[179]  Moreover, the

Tenth Circuit cited the case of <u>Loubser v. Thacker</u>[180] for the proposition that "<u>Rooker-</u>

<u>Feldman</u> did not preclude a claim for damages based on wrongdoing that had led to an

erroneous judgment."[181]  It appears, therefore, that under the reasoning of <u>Flanders</u>, none of

Renfrow's claims fall within <u>Rooker-Feldman</u> parameters.

In any event, unlike Flanders, who filed his discharge violation proceeding after losing

at trial and exhausting his appeals, Renfrow filed her Complaint *prior* to the entry of the

Judgment, and her appeal has not been decided, so the Judgment is not final for <u>Rooker-</u>

<u>Feldman</u> purposes.[182]

For all the reasons stated above, the <u>Rooker-Feldman</u> doctrine is inapplicable in this

case, and the Court's jurisdiction over this Adversary Proceeding was not divested by the

entry of the Judgment.[183]

---

[179]<u>Id</u>. at 817.

[180]440 F.3d 439 (7th Cir. 2006).

[181]<u>Flanders</u>, 657 Fed.Appx. at 817-18.

[182]"The <u>Rooker-Feldman</u> doctrine applies only if the state-court proceedings became final before the federal proceedings began."  <u>Flanders</u>, 657 Fed.Appx. at 813 n.4, *citing* <u>Exxon</u>, 544 U.S. at 284.  <u>See also</u> <u>Mann v. Boatright</u>, 477 F.3d 1140, 1146 (10th Cir. 2007); <u>Erlandson v. Northglenn Municipal Court</u>, 528 F.3d 785, 788-89 (10th Cir. 2008).

[183]Although <u>Rooker-Feldman</u> is clearly inapplicable in this case for the reasons stated above, many courts hold that <u>Rooker-Feldman</u> is never an obstacle to a bankruptcy court

2.	*Renfrow did not lose the protection of her discharge by pleading it in the Grogan Action.*

Defendants argue that when a debtor is sued on a claim that has been discharged, she has three options – remove the matter to bankruptcy court, reopen the bankruptcy case to file a proceeding to determine dischargeability under Bankruptcy Rule 4007(b),[184] or assert the defense in state court and allow the state court to determine dischargeability.[185]  Because Renfrow asserted her discharge in the Grogan Action and did not remove the action to the bankruptcy court, Defendants argue that she *chose* the state court as the forum to determine dischargeability of the UFTA claim, and must live with the result.  There is a fourth option,

_____

exercising jurisdiction to determine whether a state court judgment is void under 11 U.S.C. § 524(a)(1).  See, e.g., Gray, 573 B.R. at 876 (while Rooker-Feldman precludes review of potentially erroneous state court judgments, "a void judgment is a legal nullity"); In re Bock, 297 B.R. 22, 33 (Bankr. W.D.N.C. 2002)("Under the Rooker-Feldman Doctrine a federal court with jurisdiction over the matter may set aside a legally void state court order."); Dabrowski, 257 B.R. at 405-08; Cruz, 254 B.R. at 811-12; Meadows, 428 B.R. at 907-08. See also Egleston, 448 F.3d at 809 (without addressing Rooker-Feldman, the Fifth Circuit assumed jurisdiction, rejected preclusion arguments, and reviewed evidence adduced below to determine "whether the amounts awarded by the state court represented 'a determination of the personal liability of the debtor with respect to any debt discharged under section 727," rendering the judgment void under § 524(a)(1)).

[184]Defendants appear to concede that reopening the bankruptcy case under Bankruptcy Rule 4007 and filing a § 523 adversary proceeding to determine dischargeability of claims was not an option in this case.  No one contended that the UFTA claim was a type of claim excepted from the discharge under § 523.

[185]Defendants' Trial Brief at 2-3 and 8-9, *citing* In re Toussaint, 259 B.R. 96 (Bankr. E.D.N.C. 2000).

however, that Grogan ignores.  A debtor may file an adversary complaint in bankruptcy court to enforce the injunction.[186]  Moreover, the four options are not mutually exclusive.[187]

Renfrow chose the two options available to her.  She asserted her discharge in the Grogan Action and filed this Adversary Proceeding to vindicate her discharge.  Nevertheless, Grogan argues that Renfrow should have *removed* the Grogan Action to this Court.

The bankruptcy removal statute, 28 U.S.C. § 1452(a), states that a party "may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."[188]  Section 1334(b) confers original but not exclusive jurisdiction to federal district courts (which jurisdiction is referred by district courts to bankruptcy courts by local rule) over "civil proceedings arising under title 11, or arising in or related to cases under title 11."[189]  The phrase "arising under title 11" means a proceeding in which the cause of action is created by title 11, *i.e.*, the Bankruptcy Code.[190]  The phrase "arising in . . . cases under title 11" means proceedings that are "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the

---

[186]See Kewanee, 270 B.R. at 918.

[187]Id.

[188]28 U.S.C. § 1452(a).

[189]28 U.S.C. § 1334(b).

[190]See In re Sunnyland Farms, Inc., No. 14-10231-t11, 2019 WL 507536, at *4 (Bankr. D.N.M. Feb. 8, 2019).

bankruptcy."[191] "Related to" proceedings are those whose outcome could "conceivably have any effect on the estate being administered in bankruptcy."[192]

None of the claims asserted in the Grogan Action arose under the Bankruptcy Code, or arose in or were related to Renfrow's bankruptcy case. Grogan's claims against non-debtor Envision arose under state law. The UFTA claim against Renfrow, as pleaded, arose under state law after Renfrow filed bankruptcy. The outcome of the UFTA claim could not have any effect on to the administration of the bankruptcy estate. Thus, Renfrow did not have the option of removing the Grogan Action to this Court because the Court lacked jurisdiction over the proceeding under 28 U.S.C. § 1334.[193]

The case Grogan relies upon for her removal argument, In re Toussaint,[194] involved an unscheduled creditor who sued discharged debtors on a prepetition debt in state court. In the state court proceeding, the debtors presented a copy of their discharge, but the creditor argued that she was not bound by the discharge because she was not listed as a creditor on debtors' schedules or matrix. The state court agreed with the creditor, and entered judgment against the debtors.[195] Regrettably, the state court did not know that the debtors' Chapter 7

---

[191]Id., *quoting* Gupta v. Quincy Med. Ctr., 858 F.3d 657, 662-63 (1st Cir. 2017).

[192]Id., *quoting* Gardner v. United States (In re Gardner), 913 F.2d 1515, 1518 (10th Cir. 1990).

[193]Defendants, in one breath, argue that Renfrow should have removed the Grogan Action (Defendants' Trial Brief at 9), and in another, argue that this Court has no jurisdiction over the UFTA claim because it is a purely state law claim. Id. at 10.

[194]259 B.R. 96 (Bankr. E.D.N.C. 2000).

[195]Id. at 99.

case was a no-asset case, and it did not consider or properly apply the particular Bankruptcy Code section that governs exceptions to discharge for omitted creditors, *i.e.*, § 523(a)(3).[196] Under § 523(a)(3) and relevant case law, in a no-asset case, an omitted creditor's debt is generally *not* excepted from discharge – in other words, the debt is discharged.[197]  After the state court entered its erroneous judgment, the debtors sought relief from the judgment from the bankruptcy court.[198]  Because the state and bankruptcy courts held concurrent jurisdiction to interpret and apply § 523(a)(3) to the facts, the debtors could have removed the case to the bankruptcy court, but instead they acquiesced to the state court's jurisdiction.[199]   The

---

[196]Id. at 103.  Section 523(a)(3) states, in relevant part–

A discharge under section 727 . . . does not discharge an individual debtor from any debt–
                                          ....
      (3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, *in time to permit-*

            (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, *timely filing of a proof of claim*, unless such creditor had notice or actual knowledge of the case in time for such timely filing.

11 U.S.C. § 523(a)(3)(A) (emphasis added).

[197]Toussaint, 259 B.R. at 103-04.

[198]Id. at 100.

[199]Id. at 101.

bankruptcy court held that it lacked jurisdiction to collaterally attack the state court's judgment.[200]

Toussaint is distinguishable from this proceeding on many fronts.  Grogan was not an unscheduled creditor, so the question of whether the UFTA claim was excepted from discharge under § 523(a)(3) was not at issue.  In Toussaint, the bankruptcy court had "arising under" jurisdiction over the proceeding only because the central issue was whether the prepetition claim of an omitted creditor was excepted from discharge under § 523(a)(3).[201] Unlike the bankruptcy court in Toussaint, this Court lacked jurisdiction over the Grogan Action – the UFTA claim did not arise under the Bankruptcy Code or arise in the bankruptcy case, nor did the Grogan Action have any conceivable effect the administration of the closed bankruptcy estate.  This Court did not have concurrent jurisdiction with the state court over the Grogan Action, and Renfrow had no basis for removing the Grogan Action from state court to this Court.  Any attempt would have been futile and wasteful.[202]

Contrary to Grogan's argument, Renfrow did not *choose* to have the UFTA claim litigated in state court.  She had no choice of forum, and the holding in Toussaint is wholly inapplicable in this case.

---

[200]Id. at 104.

[201]Id.

[202]Considering that "Defendants stated over and over they were not seeking to recover for claims pre-dating Renfrow's bankruptcy filing" (Defendants' Trial Brief at 15), they are estopped from now arguing that Renfrow should have removed the Grogan Action in anticipation that Defendants might seek to recover discharged debt at trial.

### 3.    *Issue Preclusion*

Defendants assert that the doctrine of issue preclusion prevents this Court from finding that the debt reduced to Judgment was discharged.  The issue is whether this Court is precluded from making findings and conclusions that are inconsistent with the Judgment in the process of considering whether Renfrow's discharge was violated.

The Full Faith and Credit Act requires a federal court to give the same "full faith and credit" to a judgment of a state court as such judgment is given "by law or usage in the courts of such State."[203]   When a federal court evaluates the preclusive effect of a state court judgment, it looks "to the preclusion law of the State in which the judgment was rendered."[204] Under Oklahoma's doctrine of issue preclusion, the party asserting preclusion must establish: (1) a valid, final judgment on the merits in prior litigation; (2) the issue sought to be precluded is identical to one previously litigated; (3) the issue was actually litigated and necessarily determined in the prior proceeding; and (4) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum.[205]

For the purposes of preclusion, under Oklahoma law, "[a] final judgment is one in which no appeal has been perfected within the time allotted by law or one in which an appeal has been properly perfected and acted upon by the highest court whose review has been

---

[203]28 U.S.C. § 1738.

[204]Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985).

[205]See Salazar v. City of Oklahoma City, 1999 OK 20, 976 P.2d 1056, 1060–61; Nealis v. Baird, 1999 OK 98, 996 P.2d 438, 458 and n.86.

sought."[206] Renfrow has perfected an appeal of the Judgment, and the appeal is pending.[207]

Thus, the Judgment is not final for the purposes of issue preclusion.[208]

The Court also finds that Defendants deprived Renfrow of a "full and fair opportunity" to litigate critical issues relevant to her discharge.[209] Defendants' lack of candor to Renfrow, Brown, and the trial court regarding their intention to ask for damages for transfers they knew occurred prepetition, if at all, was prejudicial to Renfrow's defense.

Defendants claim that Renfrow had "full notice" of all transfers they were going to claim were fraudulent, and all the damages they intended to seek, because in one draft of the

---

[206]Nealis, 996 P.2d at 459.

[207]Defendants contend that Renfrow has not appealed her "loss" on her bankruptcy discharge defense, and therefore that particular issue has been finally determined. Defendants' Trial Brief at 17 n.3 & 18. Frankly, the Court is baffled by that argument. Renfrow's petition in error clearly seeks a reversal of the trial court's denial of her JNOV motion wherein she argued that Grogan and Phipps violated the motion in limine, misled the jury about the existence and timing of the so-called transfers, and obtained a judgment imposing personal liability on Renfrow for prepetition – that is, discharged – debts. Renfrow Exhibits 39, 44. Unlawful collection of discharged debt appears to be the focus of her appeal.

[208]Moreover, a void judgment is not a "valid" judgment, and is subject to collateral attack. See Gray, 573 B.R. at 876, citing United Student Aid Funds Inc. v. Espinosa, 559 U.S. 260, 270 (2010). "Section 524 is meant to operate automatically, with no need for the debtor to assert the discharge to render the judgment void. A bankruptcy court can find that a postpetition state court judgment is void despite the full faith and credit normally given to state court judgments." Id. at 877, quoting 4 COLLIER ON BANKRUPTCY ¶ 524.02, at 524-20 (Alan N. Resnick & Harry J. Sommer eds. 16th ed. 2016).

[209]An issue determined by a valid and final judgment may be relitigated in a later proceeding if "[t]here is a clear and convincing need for a new determination of the issue . . . because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(c).

pretrial order, Grogan sought damages of "at least $80,500."[210] According to Phipps, though, when he drafted that version of the pretrial order, he arrived at the $80,500 figure by adding the total "face value" of the receivables noted on Davis's spreadsheet and the amount realized from the sale of the fluorescein camera. At that point, not even Phipps had considered recovering $50,000 for goodwill or $30,000 for transferred equipment, so it is disingenuous to now argue that Renfrow and Brown should have known that those items were at issue.

Phipps deleted the $80,500 damages calculation in the final pretrial order after learning that Envision's bank statements revealed transfers of only $3,155. The final pretrial order is intentionally vague, as it does not specify the amount of damages at issue. Nothing in the pleadings or the final pretrial order fairly suggested that Phipps would, at closing, argue that Renfrow personally "took control" of $76,000 of receivables, or that Envision possessed $50,000 worth of goodwill that Renfrow "gave away" postpetition, or that after closing its doors, Envision still had $30,000 in equipment that Renfrow "transferred away from her creditors." In ambushing Renfrow with these previously undisclosed UFTA claims, Renfrow was deprived of an "adequate opportunity . . . to obtain a full and fair adjudication" of the validity, extent, and timing of the alleged transfers.[211]

For the aforementioned reasons, this Court is not precluded from determining whether the debt reduced to Judgment was discharged debt.

---

[210]Defendants' Trial Brief at 18.

[211]RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(c).

4.      *Grogan's liability*

Grogan contends that "no evidence whatsoever exists to demonstrate [that she] intended the actions which allegedly violated the bankruptcy discharge[.]"[212]   A debtor seeking to hold a party in contempt does not have to prove the creditor subjectively intended to collect a discharged debt, however, just that the creditor intended the acts that violated the injunction.[213]   There is no question that Grogan intended that AHN and Phipps act on her behalf in seeking damages from Renfrow at trial on the UFTA claim.

Grogan admits she authorized AHN to "seek recovery of post-bankruptcy transfers," but contends that she did not authorize AHN to attempt to collect prepetition debts or to violate the discharge injunction.[214]   Well settled principles of agency law apply to the attorney/client relationship, however, and Grogan, as principal, cannot distance herself from the acts her attorney/agents took on her behalf.[215]   "A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and (1) the agent's conduct is tortious, or (2) the agent's conduct, if that of the principal, would subject the principal to tort

---

[212]Defendants' Trial Brief at 11.

[213]Slater, 573 B.R. at 256; Peyrano, 558 B.R. at 459; Cherry, 247 B.R. at 187.

[214]Defendants' Trial Brief at 11.

[215]The Court notes that "advice of counsel" is not a defense to a civil contempt charge prosecuted under § 105(a) of the Bankruptcy Code, either.  See Peyrano, 558 B.R. at 459 (a creditor's good faith or reliance on erroneous legal advice is not relevant to whether a violation of the discharge injunction occurred); Bock, 297 B.R. at 30; Cherry, 247 B.R. at 188-89 n.19.

liability."[216] "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[217]

Grogan retained AHN to obtain a judgment against Renfrow on the UFTA claim, and there is no evidence that she revoked or renounced AHN's authority to act on her behalf at any relevant point in time.  Grogan cannot "avoid the consequences of the acts and omissions of [her] freely selected agent.  Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney."[218]

Accordingly, Grogan is liable to Renfrow to the same extent as her agent, AHN.

D.     Defendants' conduct warrants sanctions.

In a civil contempt proceeding, sanctions may include damages "to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance with a court order."[219]  "[O]nce a plaintiff has established the elements of contempt by clear and

---

[216]RESTATEMENT (THIRD) OF AGENCY § 7.04 (2006).

[217]Id. § 2.01.

[218]Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962) (quotation marks and citations omitted).  See also Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n, 886 F.3d 852, 857 (10th Cir. 2018); Gripe v. City of Enid, 312 F.3d 1184, 1188-89 (10th Cir. 2002); In re Stringer, 586 B.R. 435, 446 (Bankr. S.D. Ohio 2018) (in the context of a stay violation).

[219]Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1318 (10th Cir. 1998) (quotation marks and citations omitted).

convincing evidence, it need only prove damages by a preponderance of the evidence."[220]

Compensatory damages are "[d]amages sufficient in amount to indemnify the injured person

for the loss suffered."[221]

### 1.    *Damages for Emotional Distress*

Courts generally recognize that for an individual debtor, the discharge is not simply

a financial benefit; rather, the emotional and mental benefit of escaping the pressure of debt

collection and litigation is a "significant component" of the relief obtained.[222]   A debtor who

successfully obtains a bankruptcy discharge is entitled to expect relief from "the weight of

oppressive indebtedness" and  "a new opportunity in life and a clear field for future effort,

unhampered by the pressure and discouragement of pre-existing debt."[223]  It is reasonably

foreseeable that a creditor's renewed attempt to collect a discharged debt will exact a

psychological toll on an individual debtor.

Courts have struggled to determine if, when, and how emotional injuries may be

compensated in dollars.[224]  Generally, there is agreement that "[f]leeting or trivial anxiety or

---

[220]Id.

[221]Black's Law Dictionary, Damages (10th ed. 2014).

[222]See, e.g., In re Nordlund, 494 B.R. 507, 523 (Bankr. E.D. Cal. 2011) (one of the benefits of a Chapter 7 discharge (which is limited to individual debtors) is "peace of mind"); In re Meyers, 344 B.R. 61, 67 (Bankr. E.D. Pa. 2006) ("[a] significant component of the fresh start is being free of the kinds of harassment, threats, and anxiety that debtors were suffering before they filed") (quotation marks and citation omitted); In re Feldmeier, 335 B.R. 807, 812-15 (Bankr. D. Ore. 2005).

[223]Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934).

[224]McLean, 794 F.3d at 1325-26 ("not every willful violation of the [discharge injunction] merits compensation for emotional distress").

distress does not suffice to support an award; instead, an individual must suffer significant emotional harm."[225]

The quality and quantity of evidence needed to establish whether contemptuous conduct resulted in emotional distress is context-specific:

> When a "willful" violation of the discharge injunction is at issue, damages for mental/emotional distress may be awarded, despite the absence of any demonstrable out-of-pocket losses, if two conditions are met: (1) the debtor clearly suffered some appreciable emotional/mental harm; and (2) the actions giving rise to the emotional/mental distress were severe in nature. [Citations omitted].  As it concerns the former requirement, actual medical testimony is helpful, but not always needed. . . . In this regard, *the greater the extent of the creditor's violation, the less corroborating evidence*, *including medical testimony, . . . will be needed to establish that the debtor suffered from an appreciable amount of emotional/mental distress so as to be compensable*. The converse is also true, and thus the less severe the creditor's conduct, the more important corroborating evidence will become, particularly medical testimony, to sustain a case for compensatory damages based upon emotional/mental distress.[226]

Non-medical evidence may include the debtor's own testimony, as well as the testimony of family members, friends, or coworkers that witnessed manifestations of mental

---

[225]Dawson v. Washington Mut. Bank, F.A. (In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2004), *abrogation on other grounds recognized by* In re Gugliuzza, 852 F.3d 884 (9th Cir. 2017); Feldmeier, 335 B.R. at 814.

[226]In re Perviz, 302 B.R. 357, 371 (Bankr. N.D. Ohio 2003).  See also Nordlund, 494 B.R. at 524 (in determining causation and damages, courts ordinarily consider whether a creditor's conduct would likely cause a reasonable person to suffer emotional distress, but courts may apply a subjective standard if the creditor knew the debtor had a "special susceptibility to emotional distress"); Meyers, 344 B.R. at 67 n.10 (severity of conduct and vulnerability of the debtor are relevant to emotional distress damages; minor or technical violations may not merit compensation; debtors with "thicker skin" may not experience any distress; "vulnerable and fragile" debtors may experience extreme distress).

anguish.[227]  In some cases, however, "'significant emotional distress may be readily apparent even without corroborative evidence,' such as when a creditor engages in egregious conduct '[o]r, even if the violation . . . was not egregious, the circumstances may make it obvious that a reasonable person would suffer significant emotional harm.'"[228]

Under these standards, Renfrow's request for $50,000 as compensation for emotional distress is justified.  Renfrow provided sufficient evidence to convince this Court that she did in fact suffer severe emotional distress and anguish.  Defendants' conduct was reprehensible. Grogan, aided by her attorneys and allies, aggressively dragged Renfrow through twenty-one months (so far) of contentious and emotional litigation on a fraud claim to collect discharged debt, including a three day trial and appeal in the Grogan Action, and a two day trial in this Adversary Proceeding.   Any reasonable person in Renfrow's situation would have experienced sustained anger, frustration, anxiety, embarrassment, fear, physical illness, and the other manifestations of severe emotional distress that Renfrow and Davis described in their testimony.  The severity of Defendants' misconduct in the Grogan Action is itself evidence of causation, and is relevant to damages.  The Court concludes that $50,000 is an appropriate amount of compensation for such harm.

---

[227]Nordlund, 494 B.R. at 523.

[228]Id. (citations omitted).  See also Perviz, 302 B.R. at 372 ("given the large volume of calls made by Ocwen to collect on its debt, any reasonable person would have suffered from an appreciable amount of emotional/mental distress").

2.     *Fees and expenses.*

As an additional sanction, Renfrow seeks reimbursement of attorney fees and expenses that she incurred after the Second Amended Petition was filed in the Grogan Action in the amount of $17,306,[229] and for fees and expenses incurred in this Adversary Proceeding in the amount of $37,561.[230]   Defendants contend that because Renfrow admitted that she withdrew some funds from Envision after her bankruptcy, fees incurred defending Envision and Renfrow in the Grogan Action were not caused by Defendants' discharge violation, but instead were necessary to defend against a legitimate UFTA claim.[231]

The Court has found, however, that Defendants created the UFTA claim as a pretext to harass Renfrow and saddle her with liability for the discharged Loans. Their conduct during the course of the litigation ultimately rendered the Judgment void.  Renfrow is entitled to recover all fees and expenses that were wasted in defending litigation that resulted in a void judgment.  Renfrow should not have to bear the expense of litigating the Grogan Action

---

[229]See Renfrow Exhibit 49A.  From August 16, 2017 through April 18, 2018, Brown's firm spent a total of 62.35 hours on the Grogan Action (Brown - 53.8 hours at $275 per hour; paralegal - 8.55 hours at $75 per hour) for a total of $15,436.25 in fees.  Brown's out-of-pocket expenses totaled $1,869.75.

[230]See Renfrow Exhibits 49A-49 E.  From August 21, 2017 through November 30, 2018, Brown's firm spent at total of 100.65 hours on this Adversary Proceeding (Ron Brown - 95.25 hours at $275 per hour; paralegal - 5.4 hours at $75 per hour) for a total fee of $26,598.75.  Greggory Colpitts, Brown's co-counsel from May 29, 2018, to November 27, 2018, billed 21.55 hours at $325 per hour for a total of $7,003.75.  Joel LaCourse, Brown's co-counsel at trial, spent 11.9 hours from November 26, 2018 to November 29, 2018, but wrote off the 4.5 hours he spent familiarizing himself with the proceedings.  Accordingly, he billed 7.4 hours at $275 per hour, for a total of $2,017.50.  In addition, the firms billed a total of $1,941.36 for out-of-pocket expenses.

[231]AP Trial Tr. at 402.

simply because Defendants *might have* obtained a valid judgment if they had not crossed the line and sought damages for prepetition conduct to satisfy prepetition debt.

Defendants have not taken issue with Renfrow's counsels' hourly rates, the number of hours billed, or any particular services rendered. The Court has independently reviewed the fee statements and finds them to be reasonable, especially in light of Defendants' vigorous defense of this Adversary Proceeding.  Accordingly, Defendants will be sanctioned in the amount of $54,867 to reimburse Renfrow for her attorney fees and expenses.

### 3.     Punitive damages

In discharge violation cases, punitive damages may be awarded to punish and deter a creditor that has acted maliciously, egregiously, or vindictively, or acted intentionally and in reckless disregard for a debtor's federally protected rights under the Bankruptcy Code.[232] Courts may consider, among other things, the severity of culpable conduct, "whether the harm was the result of intentional malice, trickery or deceit,"[233] the financial vulnerability of

---

[232]Culley, 2006 WL 2091199, at *4;  Stringer, 586 B.R. at 447-48; Ridley, 572 B.R. at 364; Fauser v. Green Tree Serv. LLC (In re Fauser), 545 B.R. 907, 914-15 (Bankr. S.D. Tex. 2016); In re Haemmerle, 529 B.R. 17, 30-31 (Bankr. E.D.N.Y. 2015); Otero v. Green Tree Serv. LLC (In re Otero), 498 B.R. 313, 321-22 (Bankr. D.N.M. 2013); Nebbelink v. Wells Fargo Bank, N.A. (In re Nebbelink), 403 B.R. 113, 121-22 (Bankr. M.D. Fla. 2009); Perviz, 302 B.R. at 372.

[233]Stringer, 586 B.R. at 448.

the debtor;[234] the creditor's ability to pay damages,[235] the creditor's level of sophistication,[236] the creditor's motives,[237] and any provocation by the debtor.[238]

The Court finds and concludes that Defendants acted egregiously, vindictively, deceptively, and in knowing or reckless disregard for Renfrow's discharge.  The Second Amended Petition was a pretext to continue to harass Renfrow after she discharged the claims in the Grogan Action.  Imprecise pleading required Renfrow to hire counsel to plead with AHN to dismiss claims that were clearly discharged.

Defendants sought to make Renfrow liable for debts she recently discharged by asserting that she committed a postpetition fraud by transferring "substantial assets from [Envision's] bank accounts," a claim for which Defendants had little factual basis at the time, and even less after they discovered bank records that showed that less than $3,500 was collected and Renfrow withdrew only $3,155.  Knowing that the UFTA claim as pled was of little value, at trial Defendants tried a different UFTA claim, one not pled or disclosed to Renfrow or her counsel, one that imagined that Envision owned $120,000 in assets that Renfrow transferred to herself postpetition, assets that could have been liquidated to satisfy

---

[234]Id. at 447.

[235]Ridley, 572 B.R. at 365.  Defendants' counsel advised the Court that AHN intends to indemnify Grogan.

[236]Id.

[237]Id.

[238]Id.

Envision's debt to Grogan – in other words, pure fiction.  Defendants hid behind the log and revealed this new UFTA claim only at closing argument.

Defendants disparaged Renfrow and her federally protected right to discharge the debts she owed Grogan, and showed attitudes "contemptuous of the bankruptcy process."[239] Defendants invited Renfrow's abusive, litigious estranged husband to testify at trial, even though Renfrow had an enforceable protective order against him.  Then, Defendants had the audacity to argue that Renfrow could not have suffered emotional distress from the ordeal they put her through because she was already emotionally depleted from the divorce and custody proceedings.  Grogan, Pettigrew, and Erin Renfrow cooperated to carry out their collective grudge against Renfrow.  The fact that Defendants knew Renfrow was vulnerable emotionally and financially is an aggravating circumstance in the calculus of punitive damages.

AHN is a well-respected law firm that cannot claim a lack of sophistication concerning the nature of the discharge injunction and the gravity of acting in contempt thereof.  It had fair notice that any actions it took in the Grogan trial to prosecute claims that arose prepetition could result in punitive damages because at that time, AHN was already a party to this Adversary Proceeding wherein Renfrow was seeking punitive damages for previous discharge violations.  AHN's cavalier disregard for Renfrow's rights under the discharge, in the name of zealous advocacy, indicates that a punitive award is needed to gain its attention,

---

[239] In re Cowen, 849 F.3d 943, 951 (10th Cir. 2017).

provide an incentive to respect the bankruptcy process and the power and scope of the discharge, and deter future violations.

Accordingly, the Court assesses punitive damages against Defendants in the amount of $100,000.

## IV.    Conclusion

The Court concludes as follows:

1.    The Judgment is void under § 524(a)(1).  Defendants are directed to obtain an order vacating the Judgment against Renfrow as void, to dismiss the Grogan Action against Renfrow, and to take any other action reasonably requested by Renfrow to evidence the fact that the Judgment against her is and was void *ab initio*.

2.    Defendants are liable to Renfrow, jointly and severally, for damages to compensate Renfrow for emotional distress, including the cost of therapy, in the amount of $50,000.

3.    Defendants are liable to Renfrow, jointly and severally, for damages to compensate Renfrow for attorney fees and costs incurred in defending the Grogan Action in the amount of $17,306.

4.    Defendants are liable to Renfrow, jointly and severally, for damages to compensate Renfrow for attorney fees and costs incurred in this Adversary Proceeding, in the amount of $37,561.

5.    Defendants are liable to Renfrow, jointly and severally, for punitive damages in the amount of $100,000.

A separate judgment will be entered contemporaneously herewith.[240]

**SO ORDERED** this 23rd day of April, 2019.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[240]In their Trial Brief, Defendants moved for summary judgment on various issues. Those motions are denied in light of the findings and conclusions stated herein. After the close of evidence at trial, Defendants also moved for a "directed verdict" on the same issues, which is also denied.  Defendants filed a Motion in Limine (Doc. 84) on the first day of trial. Defendants' evidentiary objections contained in the motion were ruled upon on the record as they were raised at trial.